# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
January 4, 2006 Session

## STATE OF TENNESSEE v. STEVEN JAMES ROLLINS

### Direct Appeal from the Court of Criminal Appeals
### Circuit Court for Sullivan County

### No. S45,685    R. Jerry Beck, Judge

### No. E2003-01811-SC-DDT-DD  - Filed March 16, 2006

The defendant, Steven James Rollins, was convicted of premeditated murder, felony murder, and especially aggravated robbery.  The trial judge merged the felony murder conviction with the premeditated first degree murder conviction.  Upon conclusion of the sentencing hearing, the jury found that the State had established beyond a reasonable doubt the following five aggravating circumstances: (1) the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; (4) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery; and (5) the victim of the murder was seventy (70) years of age or older.  See Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), (7), (14) (1999).  After further finding that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury imposed a sentence of death.

The defendant appealed, challenging both his conviction and sentence of death.[1]  The Court of Criminal Appeals affirmed.  The case was automatically docketed in this Court.  See Tenn. Code Ann. § 39-13-206(a)(1).  Thereafter, this Court entered an order specifically requesting that the parties address the following three issues at oral argument:[2]  (1) whether the interrogation of the defendant by the sheriff's officers after his arrest violated the defendant's state and federal constitutional rights to counsel such that the trial court erred by refusing to suppress the defendant's statements; (2) whether the trial court erred in refusing to allow the defendant to call his co-defendant, Greg Fleenor, to the witness stand to invoke his privilege against self-incrimination in

---

[1]The defendant has not challenged his conviction of especially aggravated robbery or his sixty-year sentence for this crime, which the trial court imposed consecutively to the death sentence.

[2]"Prior to the setting of oral argument, this Court shall review the record and briefs and consider all errors assigned.  The Court may enter an order designating those issues it wishes addressed at oral argument. . . ."  Tenn. R. Sup. Ct. 12.2.

the jury's presence; and (3) whether the mandatory review provisions of Tennessee Code Annotated section 39-13-206(c)(1) require reversal of the defendant's death sentence.[3]  Upon thoroughly considering these and all issues raised by the defendant,  the record on appeal, and the relevant authority, we affirm the defendant's conviction of first degree murder and sentence of death.

**Tenn. Code Ann. § 39-13-206(a)(1);**
**Judgment of the Court of Criminal Appeals Affirmed**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined.  ADOLPHO A. BIRCH, Jr., J., filed a concurring and dissenting opinion.

H. Randolph Fallin, Mountain City, Tennessee; Roger G. Day, Johnson City, Tennessee (at trial[4] and on appeal) for the appellant, Steven James Rollins.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Michelle Chapman McIntire, Assistant Attorney General; H. Greeley Wells, District Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. BACKGROUND**

**A.  Guilt Phase**

The proof offered by the prosecution at trial established that the defendant, thirty-seven-year-old Steven James Rollins, killed the eighty-one-year-old victim, John Bussell, during a robbery.  For thirty years prior to his murder, Bussell owned and operated the Fisherman's Paradise bait shop and barbeque restaurant in the Colonial Heights area of Sullivan County near Kingsport, Tennessee.  Bussell, a widower, lived alone in a camper next door to the bait shop.  Although Bussell suffered from arthritis, bad eyesight, and breathing difficulties, he had remained active and independent for a person of his age.  Local residents were aware that Bussell frequently accommodated customers by opening his business late at night to sell bait or fishing and camping supplies.  Furthermore, local residents were aware that Bussell carried large amounts of cash on his person, at least $1,000 to $1,500 at any given time, according to Walter Hoskins, Bussell's friend of five years and maintenance man.  Hoskins recalled that Bussell often displayed this "wad" of cash as he provided

---

[3]"Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned.  The Court may enter an order designating those issues it wishes addressed at oral argument."  Tenn. Sup. Ct. R. 12.2.

[4]As the Court of Criminal Appeals noted, attorneys James T. Bowman and Stacy L. Street were initially appointed to represent the defendant at trial and argued various pre-trial motions on his behalf.  However, these attorneys were allowed to withdraw prior to trial.

change to customers. Hoskins and other of Bussell's friends and relatives cautioned Bussell against opening the bait shop late at night while he was alone and against making change from his "wad" of cash, but to Hoskins' knowledge, Bussell continued to operate his business as he had for the preceding thirty years. Bussell owned and carried a handgun for his protection, and in July 2001, approximately one-month before his murder, Bussell purchased a two-shot Derringer handgun and carried it with him at all times in his right front pants pocket. Hoskins was the last person to speak with Bussell before his murder. Bussell telephoned Hoskins at 10:30 p.m. on August 21, 2001, to discuss Hoskins' plans for the next day.

Ottie McGuire, who had been Bussell's friend for ten years, arrived at the bait shop around 8:30 a.m. on the morning of August 22, 2001, intending to have breakfast with Bussell, as was their custom. McGuire became worried when he noticed that the restaurant lights were off and the door still locked. McGuire walked next door and found the door to Bussell's camper partly open and the morning newspaper still in the box. McGuire knocked on the camper's window and called for Bussell, and when Bussell failed to respond, McGuire went to a nearby fire hall for help, fearing that Bussell had suffered a heart attack.

Eventually Sullivan County Deputy Sheriff Jamie Free arrived at the bait shop. After looking through a window and seeing the victim's head lying on the floor of the bait shop between two display racks, Officer Free removed the chained "closed"sign and kicked open the locked door. Officer Free then found Bussell's body lying in a pool of blood on the floor behind the counter of the bait shop. Bussell was clothed in pajamas and house slippers; his clothing was blood-soaked; and he was not breathing. The cash register was open and empty; the change drawer, also empty, was lying on the floor beside the body. Several minnows and cups used to dip out the minnows were on floor near the minnow tank. Bussell's Derringer was missing. A trail of bloody footprints led from inside the bait shop to the victim's camper, which had been ransacked. Blood smears were found inside the camper on a variety of the victim's personal belongings. A wad of $1,150 in cash was found lying on the floor of the camper covered by other items.

Forensic experts from the Tennessee Bureau of Investigation Crime Laboratory ultimately spent 112.5 man hours processing the bait shop, the camper, and the area outside but found no physical evidence tying anyone to the crime. The blood found at the scene belonged to the victim. Investigators neither discovered identifiable latent fingerprints nor shoes belonging to a suspect which could be compared to the bloody footprints found at the scene.

An autopsy disclosed that the victim had sustained twenty-seven and possibly twenty-eight knife wounds and had bled to death from these wounds. While most of these injuries would not have been immediately fatal, a deep six-inch cutting wound that began near the victim's left ear and extended across his neck had sliced through his left common carotid artery and jugular vein and would have rendered the victim immediately unconscious and led to his death within four minutes. Another incised wound to the victim's neck had cut into his right jugular vein and would have been fatal without prompt medical care. A third stab wound to the victim's shoulder had penetrated the victim's lung and heart and would also have been fatal without immediate medical care. In addition, Dr. Gretel Harlan Stevens, the forensic pathologist who performed the autopsy, noticed multiple painful but non-life threatening stab wounds to the victim's collarbone, chest, abdomen, back, and

hands. Dr. Stevens testified that the all of these wounds would have been painful, some more than others, but none of these wounds was itself life threatening. Dr. Stevens further explained that the presence of blood on the victim's feet and clothing as well as defensive wounds to his hands indicated that he had been injured but had remained alive and had struggled with and fled from his attacker. Dr. Stevens opined that the nature of the wounds suggested that the victim initially did a "fairly good job" fending off his attacker, considering his age and health.

Shortly after the victim's murder, Richard Russell, chief investigative officer for the Scott County, Virginia Sheriff's Department, reported to the Sullivan County Sheriff's Department a conversation that he had with the defendant about one month before the murder. In particular, the defendant told Officer Russell that two of the defendant's acquaintances had mentioned robbing "an old guy . . . that owned some kind of a bait shop . . . and taking his money." At that time, Officer Russell believed that the defendant was referring to a crime that had already been committed. After determining that no such crime had occurred, Officer Russell forgot about the defendant's statement. After learning of the victim's murder, Officer Russell relayed the information to the Sullivan County Sheriff's Department.

On August 25, 2001, the defendant and his girlfriend, Angela Salyers, were interviewed by Sullivan County officers. The defendant agreed to accompany the officers to the Sheriff's Department for questioning. Sullivan County Detective Bobby Russell interviewed the defendant, whom he described as cooperative and responsive. The defendant expounded upon the information he previously had given to the Virginia police, telling Detective Russell that about one month earlier Ricky Frasier, for whom the defendant worked as a roofer, and Larry Cowden, the defendant's co-worker, mentioned going to the trailer of an old man who had a large sum of money and "knocking on the trailer and knocking him in the head. He said he had maybe $40,000.00 or something." The defendant further admitted that, about three weeks earlier, he had accompanied Frasier and Cowden to a drive-in restaurant across the road from the victim's trailer while they watched the victim's trailer, but the defendant denied ever meeting the victim or participating in or knowing anything about the victim's murder.

The police continued to investigate the victim's murder and received information which, on September 26, 2001, resulted in the underwater investigation team of the Sullivan County Sheriff's Department retrieving Bussell's Derringer from the Holston River. In the meantime, the defendant and Angela Salyers left Tennessee and traveled to a rural area in Michigan's Upper Peninsula, a two-day drive from Sullivan County. On October 9, 2001, Sullivan County officers arrested the defendant and Salyers in Michigan. After receiving Miranda[5] warnings and signing a waiver of

---

[5]In Miranda v. United States, 384 U.S. 436, 479 (1966), the United State Supreme Court held that prior to custodial interrogation, the police must inform a suspect

> that he has the right to remain silent, that anything he says can be used against him in a court of
> law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one
> will be appointed for him prior to any questioning if he so desires.

those rights, the defendant gave a statement in Michigan admitting that he had killed Bussell. The defendant then waived extradition, and he and Saylers returned to Tennessee with the Sullivan County officers. The group arrived late on October 11, and the defendant then asked to speak with officers "to clear up" some things. Due to the lateness of the hour, the officers delayed meeting with the defendant until October 12. At that time, the defendant gave a second statement recounting his involvement in the robbery and murder of the victim. This second statement was consistent with the first, but provided additional detail.

The substance of the defendant's two statements was that he and Gregory "Kojack" Fleenor were discussing ways to get money to buy cocaine when the defendant suggested robbing the victim. The defendant purchased four pairs of gloves at a convenience store. The defendant, Fleenor, Salyers, and Fleenor's girlfriend, Ashley Cooper, then drove to the victim's bait shop around midnight. The defendant rang the doorbell at the shop. When no one answered, the defendant knocked on the door of the camper. The victim answered, and the defendant told the victim that he needed to buy some bait. The defendant followed the victim into the bait shop, and, while the victim was bent over dipping minnows from the tank, the defendant grabbed the victim's shoulder. When the victim reached for his gun, the defendant pulled a lock-blade knife from his pocket and began stabbing the victim. The defendant could not remember how many times he had stabbed the victim. After the stabbing, the defendant made sure the victim was dead by shaking him, and then the defendant washed his hands and his knife in the minnow tank before joining Fleenor in searching through the victim's camper for money, drugs, and anything else of value. Fleenor found $1,000 to $1,200 in the victim's wallet. The group then drove to Knoxville, where Fleenor purchased cocaine, which the group consumed. The defendant threw away the victim's wallet and the clothing that the defendant had been wearing when he killed the victim. The defendant also threw the victim's gun into the Holston River. According to the defendant, Fleenor suggested that he kill the victim and that they "leave no witnesses." The defendant insisted that he never intended to kill the victim and that he had been "strung out" on cocaine the entire evening. He concluded his last statement with the admission: "I know I should be punished."

Contradicting both of these statements, the defendant testified at trial that Fleenor had killed the victim. The defendant maintained that he had been afraid of Fleenor and was unaware that Fleenor had planned to rob or to kill the victim. At Fleenor's instruction, the defendant went into the bait shop to buy some bait while Fleenor "checked things out." The defendant left the bait shop after telling Fleenor to pay the victim for the minnows. Fleenor agreed but instructed the defendant to sneak into the camper and steal anything of value he could find. The defendant ransacked the camper for five or ten minutes until Fleenor joined him. When the defendant asked where the victim was, Fleenor responded, "I took care of it." The defendant testified that he thought this meant that Fleenor had hit the victim in the head. Fleenor, however, eventually told the defendant that he had killed the victim by "cutting" him, warned the defendant to keep his mouth shut, and threatened to kill Salyers, Cooper, and members of the defendant's family if the defendant did not keep quiet. The defendant testified that he only had "a little, bitty Old Timer" knife in his pocket while Fleenor had a lock-blade knife. The defendant said that he could not read or write, that he provided the October 9th statement because officers promised that he could ride from Michigan to Tennessee in the same car with his girlfriend, Salyers, and that he had accepted blame for the killing because he was afraid of Fleenor and of Fleenor's father, both of whom were incarcerated with the defendant in the

-5-

Kingsport jail. The defendant admitted on direct examination that he had fifteen prior felony convictions but pointed out that he had pleaded guilty in each case because he had been guilty. On cross-examination, the defendant intimated that the Sullivan County investigators had supplied the details of the statements he had given. The defendant explained that he had initialed the erroneous and false written statements because he could neither read nor write with any proficiency. For purposes of impeachment the defendant acknowledged that he had thirteen prior convictions for aggravated burglary from August 1995 to November 1996 and one conviction of felony theft.

Testifying in rebuttal for the State, Detective Bobby Russell, the officer who had taken the defendant's statements, denied supplying the defendant with details concerning the victim's murder. Another officer, Karen Watkins, testified to rebut the defendant's testimony concerning events occurring during the ride from Michigan to Sullivan County. Rana Jandron of the Marquette County Sheriff's Department in Michigan testified that the defendant told her that he could read and write a little bit, "enough to write a letter." A videotape of the defendant's booking in Michigan showing the defendant making this statement was played for the jury. Finally, Angela Salyers, the defendant's girlfriend, testified that the defendant could read and write, that the defendant had owned a lock-blade knife with a four-inch blade at the time of the victim's murder, and that the defendant had attacked and killed the victim. Salyers admitted that she had been tried for first degree murder in connection with the victim's murder and had been convicted of facilitation of robbery.

The jury found the defendant guilty of premeditated first degree murder, felony first degree murder, and especially aggravated robbery.

### B. Sentencing Phase

At the sentencing hearing, the State introduced certified copies of the defendant's two 1996 aggravated assault convictions in Hawkins County, Tennessee. The State also presented photographs of some of the wounds inflicted on the victim. Dr. Gretel Stevens testified at the sentencing phase that none of these injuries had been fatal, that some of these injuries were inflicted while the victim was alive and standing or walking about, and that these injuries would have been painful. The last witness for the State was Marie Carpenter, the victim's niece, through whom the State presented victim impact testimony. Carpenter testified that the eighty-one-year-old victim had no children and had been a father-figure to her. Carpenter explained that she talked with the victim by telephone every night, saw him weekly, and sometimes drove him to the doctor. The victim had operated his bait shop and barbecue restaurant for thirty years. Although the victim was not in the best of health, he was still able to come and go as he wished. In closing, the State specifically announced that it relied on the proof presented at the guilt phase.

The only mitigation proof offered by the defense was a report by a school psychologist dating from 1978, when the defendant was in his early teens. The report reflected that the defendant's parents were divorced and that the defendant lived with his grandmother. His mother, who had a third-grade education, was not well physically or mentally. No information was available regarding the defendant's father. The defendant's older brother was in the Army. According to the report, the defendant had received speech therapy, was enrolled in vocational training in auto body

work, and was repeating the seventh grade. His school grades were mostly Ds and Fs. Teacher comments indicated that he was "basically a non-reader" and could not spell or write. When tested in March 1978, the defendant's I.Q. fell within the borderline defective range, slightly above mentally retarded. The report also noted that the defendant had the academic skills of a second grader. A re-evaluation, performed about six months later, confirmed that the defendant's I.Q. was borderline defective.

Following deliberations, the jury found that the prosecution had proved the following five aggravating circumstances beyond a reasonable doubt: (1) the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; (4) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery and (5) the victim of the murder was seventy (70) years of age or older. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), (7), (14) (1999). Upon finding that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury imposed a sentence of death. The defendant appealed, challenging his conviction and sentence. The Court of Criminal Appeals affirmed, and the case was docketed in this Court. We affirm the judgment of the Court of Criminal Appeals.

## II. ANALYSIS

### A. Electronic Recording of Interrogations

The defendant argues that the trial court should have suppressed all of his statements because the Sullivan County Sheriff's Department has a policy against electronically recording interrogations. The defendant maintains that such a policy contravenes the heightened due process concerns that apply in capital cases. We disagree.

In State v. Godsey, 60 S.W.3d 759 (Tenn. 2001), this Court rejected the argument that failing to electronically record interrogations requires suppression of any statements resulting from the interrogations. We acknowledged that courts in Alaska and Minnesota require interrogations to be electronically recorded, id. at 771, but we pointed out that courts in fifteen other states had refused to impose such a requirement, id. at 772 n.7. More importantly, we emphasized that "neither the state nor the federal constitution requires electronic recording of interrogations." Id. at 771.

Although we found no constitutional or statutory authority mandating that interrogations be electronically recorded, we recognized in Godsey that such a rule would reduce the amount of time spent in court resolving disputes over what occurred during interrogations and relieve the judiciary of the burden of resolving such disputes. Id. at 772. We further opined that given "the slight inconvenience and expense associated with electronically recording custodial interrogations, sound policy considerations support its adoption as a law enforcement practice." Id. Ultimately, however,

we held that "the issue of electronically recording custodial interrogations 'is one more properly directed to the General Assembly.'" Id. (quoting State v. Odom, 928 S.W.2d 18, 23-24 (Tenn. 1996)). In so holding, we emphasized that "'[t]he determination of public policy is primarily a function of the legislature.'" Id. (quoting Griffin v. Shelter Mut. Ins. Co., 18 S.W.3d 195, 200-01 (Tenn. 2000)).

The defendant has failed to present any argument that casts doubt upon the soundness of our holding in Godsey. Rather, the Texas and Illinois statutes[6] the defendant cites lend further support for our conclusion that this issue is more properly addressed by legislative action. Indeed, as the defendant points out, since our decision in Godsey, the Tennessee General Assembly passed a joint resolution directing the Tennessee Law Enforcement Advisory Counsel to study and to evaluate issues relating to electronic recording of custodial interrogations and to report back to the House and Senate Judiciary Committees.[7] Thus, we remain convinced that whether, as a matter of public policy, Tennessee should mandate electronic recording of custodial interrogations is a question for the General Assembly, not this Court. A defendant's statement need not be suppressed because a law enforcement agency has adopted a policy against recording interrogations. Such a policy does not violate the heightened due process concerns that apply in capital cases. Thus, the trial court did not err by refusing to suppress the defendant's statements on this basis.

## B. Failure to Suppress Post-Arrest Statements

The defendant contends that the right to counsel guaranteed him by the Sixth Amendment to the United States Constitution[8] and Article I, section 9 of the Tennessee Constitution[9] attached on October 3, 2001, when the Sullivan County Grand Jury returned a presentment charging him with first degree murder and especially aggravated robbery. The defendant further contends that on October 9 and 12, 2001, officers of the Sullivan County Sheriff's Department violated his Sixth Amendment right to counsel[10] by questioning him without his attorney being present. Thus, according to the defendant, the trial court erred by failing to suppress the statements that resulted

---

[6]20 Ill. Comp. Stat. Ann. 3930/7.2 (West 2005); Texas Code Crim. Proc. Ann. art. 38.22 (Vernon 2005).

[7]2002 House Joint Resolution 862 ("[T]he Tennessee Law Enforcement Advisory Council . . . is hereby directed to study and evaluate all issues relevant to the electronic recording of custodial interrogations of criminal defendants, including current practices and procedures of law enforcement agencies in Tennessee." ).

[8]In relevant part, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The Fourteenth Amendment makes the Sixth Amendment's guarantee of the right to counsel obligatory upon the states. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963).

[9]In relevant part, Article I, section 9 provides "[t]hat in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel . . . ."

[10]This Court has previously construed the right to counsel under Article I, section 9 consistently with the Sixth Amendment right to counsel. See, e.g., State v. Blye, 130 S.W.3d 776 (Tenn. 2004); State v. Martin, 950 S.W.2d 20 (Tenn. 1997). Thus, for ease of reference, "Sixth Amendment right to counsel" will be used herein to refer to both the state and federal constitutional right to counsel.

from these unconstitutional interrogations.

The State responds that the defendant waived both his Fifth and Sixth Amendment right to counsel before the officers questioned him on October 9 and 12, 2001. According to the State, the subsequent interrogations were lawful and the resulting statements were properly admitted by the trial court. We agree.

The right to counsel guaranteed by the Sixth Amendment and by Article I, section 9 attaches at the time the State initiates adversarial judicial proceedings against the defendant. Michigan v. Jackson, 475 U.S. 625, 629 (1986); Blye,130 S.W.3d at 780; State v. Huddleston, 924 S.W.2d 666, 669 (Tenn. 1996). In Tennessee, the adversarial judicial process is initiated when formal charges are filed – i.e., an arrest warrant issues, a preliminary hearing is held (if no arrest warrant is issued), or an indictment or presentment is returned. Blye, 130 S.W.3d at 780; Huddleston, 924 S.W.2d at 669 (citing State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980)). The defendant's Sixth Amendment right to counsel attached therefore on October 3, 2001, when the Sullivan County Grand Jury returned a presentment charging him with first degree murder and especially aggravated robbery. Nonetheless, that the defendant's Sixth Amendment right to counsel came into existence with the presentment and that he had such a right at the time of his questioning does not necessarily mean that the police questioning violated his Sixth Amendment right.

In Patterson v. Illinois, 487 U.S. 285 (1988), which involved post-indictment questioning of the defendant by the police and a prosecutor, the United States Supreme Court considered whether the Miranda warnings adequately informed the defendant of both his Fifth and Sixth Amendment right to counsel. The Court rejected Patterson's argument–an argument also advanced by the defendant in this case–that the police were completely barred from approaching him once his Sixth Amendment right came into existence. Id. at 291. The Court reasoned:

> The State's decision to take an additional step and commence formal adversarial proceedings against the accused does not substantially increase the value of counsel to the accused at questioning, or expand the limited purpose that an attorney serves when the accused is questioned by authorities. With respect to this inquiry, we do not discern a substantial difference between the usefulness of a lawyer to a suspect during custodial interrogation, and his value to an accused at postindictment questioning.

Id. at 298-99; see also Iowa v. Tovar, 541 U.S. 77, 89 (2004) (discussing and reaffirming Patterson's "pragmatic approach to the waiver question"). The Court explained that Miranda warnings effectively convey to a defendant his right to have counsel present during questioning and also adequately inform a defendant of "the ultimate adverse consequence" of making uncounseled admissions, i.e., that his statements may be used against him in any ensuing criminal proceeding. Patterson, 487 U.S. at 293. The Court further explained that Miranda warnings "suffice[] . . . to let [the defendant] know what a lawyer could 'do for him' during the postindictment questioning" namely, advise him to refrain from making statements that could prove damaging to his defense. Id. at 294. Accordingly, the Court held that "[s]o long as the accused is made aware of the 'dangers and disadvantages of self-representation' during postindictment questioning, by use of the Miranda

warnings, his waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'" Id. at 300. The Patterson Court expressly rejected the argument that any waiver of the Sixth Amendment right to counsel in the context of postindictment questioning can only be properly made before a neutral judicial officer. Id. at 295 n.8.

Applying to this case the analysis adopted in Patterson, we have no hesitation in concluding that the defendant's post-presentment statements were not obtained in violation of his Sixth Amendment right to counsel. After arresting the defendant in Michigan on October 9, 2001, Detective Bobby Russell not only informed the defendant of the charges against him, but he also provided the defendant Miranda warnings. The defendant not only agreed to speak with Detective Russell, but he also signed an advice and waiver of rights form. Furthermore, after Detective Russell reduced the defendant's oral statement to writing and read the statement to the defendant, the defendant reviewed the statement and initialed and signed the beginning and end of each page, including the last sentence, which states: "This is a true and correct statement. I've not been threatened, promised anything, or coerced." Following an hour and a half interview, the defendant spent the night at the local jail, appeared before a Marquette County, Michigan, magistrate the next morning, and waived extradition to Tennessee. At the defendant's request, he and Salyers were allowed to travel back to Tennessee in the same car. During the two-day drive, the defendant never once requested an attorney.

Instead, shortly after arriving in Sullivan County on the evening of October 11, the defendant asked to speak with the detectives to "clear up" his previous statement. Detectives met with the defendant the next afternoon, October 12, and again provided him Miranda warnings. The defendant again executed a waiver of his rights before giving the police a second incriminating oral statement consistent with the first. Detective Russell again reduced the oral statement to writing, read it to the defendant, and allowed the defendant to read it. After the defendant initialed each page of the statement, he agreed to provide a blood sample and signed a consent form for that purpose.

Here, as in Patterson, the defendant was meticulously informed by the authorities of his right to counsel and of the consequences of failing to exercise that right before he confessed to the murder of John Bussell.[11] On two separate occasions the defendant elected to forgo the assistance of counsel and instead chose to speak directly to law enforcement officials concerning his role in the murder. The defendant actually requested a second interview with the detectives to clarify his October 9th statement. We conclude therefore, consistent with Patterson, that the defendant waived his Sixth Amendment right to counsel and hold that the trial court did not err by refusing to suppress the statements that resulted from the post-presentment interrogations.[12]

---

[11]Not only did the defendant receive Miranda warnings, he admitted at the suppression hearing that he was aware of his right to counsel from his prior experience with the criminal justice system.

[12]We hasten to note, as did the Patterson Court, that our holding does not mean that all Sixth Amendment challenges to the conduct of post-presentment or post-indictment questioning will fail whenever the challenged practice would pass constitutional muster under Miranda. See Patterson, 487 U.S. at 296 n.9 (discussing the circumstances in which a Miranda waiver will not suffice for Sixth Amendment purposes).

## C.  In-Court Assertion of Fifth Amendment Privilege

As previously stated, during pre-trial custodial interrogations, the defendant admitted his involvement in the victim's murder and provided detailed factual information about how the murder occurred.  However, at trial the defendant contradicted his pre-trial statements and maintained that Gregory Fleenor had murdered the victim, that he had been unaware of Fleenor's plan to rob and to kill the victim, and that he had lied previously about his involvement in the victim's murder because he had been afraid of Fleenor and Fleenor's father, both of whom were incarcerated with the defendant.

Not surprisingly, on cross-examination the prosecution closely questioned the defendant about his testimony implicating Fleenor in the victim's murder.  At one point, the prosecutor asked the defendant, "Mr. Fleenor, by the way, is back here in the jail as of today, as we speak right now, is he not?" The defendant replied, "Yes, Sir."  "At the request of your attorneys?" continued the prosecutor. "Yes, Sir," answered the defendant.  Defense counsel did not contemporaneously object to this exchange; however, defense counsel raised the issue before the trial resumed the next morning.  The defense maintained that the prosecutor's cross-examination of the defendant had strongly suggested to the jury that Fleenor was available to testify, that the defense knew of his availability, and that the defense had chosen not to call Fleenor as a witness because the defense did not want the jury to hear Fleenor's testimony.  Defense counsel explained that, before the prosecutor's cross-examination, the defendant had decided not to call Fleenor as a witness because the defendant had discovered, upon interviewing Fleenor, that Fleenor would invoke the Fifth Amendment privilege against self-incrimination if called as a defense witness.  However, defense counsel maintained that the only way to eliminate the implications created by the prosecutor's cross-examination of the defendant was to allow Fleennor to invoke his Fifth Amendment privilege in the jury's presence and thereby to inform the jury of Fleenor's unavailability as a witness.  The trial court allowed the defense to call Fleenor and make an offer of proof, but the trial court refused to allow the defendant to call Fleenor as a witness to invoke the privilege against self incrimination in the jury's presence.  The Court of Criminal Appeals affirmed.

The trial court and the Court of Criminal Appeals relied upon State v. Dicks, 615 S.W.2d 126 (Tenn. 1981).   Jeffrey Stuart Dicks and Donald Wayne Strouth were charged with first degree murder in connection with the killing of James Keegan.  By the time Dicks was tried, Strouth had already been convicted of first degree murder and sentenced to death, and his case was pending on appeal to this Court.  Dicks sought to compel Strouth to testify, even though Strouth had not testified at his own trial.  At a jury-out hearing, the trial judge determined that Strouth would invoke his privilege against self-incrimination if called to testify at Dicks' trial.  The trial judge therefore "excused Strouth from taking the stand."  Dicks, 615 S.W.2d at 129.  In this Court, Dicks argued that the trial court had erred by refusing to compel Strouth to take the stand and to claim his Fifth Amendment privilege in the jury's presence.  Id.  Seeing "no basic error in the trial judge's action," this Court rejected the defendant's argument, explaining as follows:

> The calling of a witness who will refuse to testify does not fill the purpose of compulsory process, which is to produce testimony for the defendant.  United States v. Roberts, 503 F.2d 598, 600 (9th Cir. 1974).  But if it did, where there is a conflict

between the basic right of a defendant to compulsory process and the witness's right against self-incrimination, as in this case, the right against self-incrimination is the stronger and paramount right. Frazier v. State, 566 S.W.2d 545, 551 (Tenn. Crim. App. 1978). See United States v. Johnson, 488 F.2d 1206 (1st Cir. 1973); United States v. Wyler, 487 F.2d 170 (2nd Cir. 1973); United States v. Beye, 445 F.2d 1037 (9th Cir. 1971). Further, a jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege against self-incrimination, whether those inferences be favorable to the prosecution or the defense. Bowles v. United States, 439 F.2d 536, 541 (D.C. Cir. 1970).

Dicks, 615 S.W.2d at 129. The rule adopted in Dicks remains the majority rule applied throughout the country. See, e.g., United States v. Castorena-Jaime, 285 F.3d 916, 931 (10th Cir. 2002); People v. Cudjo, 863 P.2d 635, 658 (Cal. 1993); People v. Dikeman, 555 P.2d 519, 520-21 (Colo. 1976); State v. Bryant, 523 A.2d 451, 457 (Conn. 1987); State v. Haddad, 767 So. 2d 682, 686 (La. 2000); Commonwealth v. Gagnon, 557 N.E.2d 728, 737 (Mass. 1990); State v. McGraw, 608 A.2d 1335, 1339 (N.J. 1992); Commonwealth v. Greene, 285 A.2d 865, 867 (Pa. 1971); State v. Hughes, 493 S.E.2d 821, 824 (S.C. 1997); Horner v. State, 508 S.W.2d 371, 372 (Tex. Cr. App. 1974); see generally Wayne R. Lafave , Jerold H. Israel, and Nancy J. King, 5 Criminal Procedure § 24.4(c) (2d ed. & 2005 Supp.); Annotation, 24 A.L.R.2d 895.

The rule is grounded not only in the constitutional notion that guilt may not be inferred from the exercise of the Fifth Amendment privilege but also in the danger that a witness's invoking the Fifth Amendment in the presence of the jury will have a disproportionate impact on their deliberations. The jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.' In reality the probative value of the event is almost entirely undercut by the absence of any requirement that the witness justify his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination.

Bowles, 439 F.2d at 541-42 (internal citations omitted) (cited with approval in Dicks, 615 S.W.2d at 129); see also Gagnon, 557 N.E.2d at 737 ("[C]alling [the witness] to the stand in the face of his expressed intention to invoke his privilege against self-incrimination would have produced no relevant evidence, while inviting the jury to engage in unwarranted and impermissible speculation.")

No doubt recognizing the wide acceptance of the rule, the defendant does not ask us to abrogate the rule adopted in Dicks. Rather, the defendant maintains that the rule does not control this case. The defendant asserts that by calling Fleenor to invoke the privilege in the jury's presence he meant only to rebut the negative inferences the prosecution attempted to create by its cross-examination questions, not bolster his defense. According to the defendant, this factual distinction is controlling. We disagree. Although the factual contexts differ, the applicable legal principle remains the same–"a jury is not entitled to draw *any* inferences from the decision of a witness to exercise his constitutional privilege against self-incrimination, *whether those inferences be favorable to the prosecution or the defense*." Dicks, 615 S.W.2d at 129 (emphasis added). Notwithstanding the defendant's assertions to the contrary, the record supports a conclusion that the defendant meant to create a favorable inference for the defense by having Fleenor invoke his privilege in the jury's

presence. Courts have recognized that "jurors tend to view a witness' invocation of the privilege as a 'clear confession of crime.'" State v. Corrales, 676 P.2d 615, 622 (Ariz. 1983) (quoting 8 J. Wigmore, Evidence § 2272, at 426 (McNaughton rev. ed. 1961)). During his testimony, the defendant portrayed Fleenor as the planner and perpetrator of the victim's murder. Yet, during his offer of proof, the defendant refused either to pose specific questions to Fleenor concerning his role in the murder or to challenge Fleenor's right to assert the privilege.[13] Under these circumstances we conclude that the trial court and the Court of Criminal Appeals properly applied the rule announced in Dicks and correctly refused to allow the defendant to call Fleenor for the sole purpose of asserting his Fifth Amendment privilege against self-incrimination in the jury's presence.

Our holding should not be viewed as approval of the cross-examination questions that precipitated the defendant's request to call Fleenor to invoke the privilege in the jury's presence. Nonetheless, even assuming these questions were improper, as the defendant argues, the fact remains that the trial court lacked authority to ignore Dicks and to remedy this impropriety by allowing the defendant to call Fleenor to assert the privilege in the jury's presence. However, had the defendant so requested, the trial court could properly have given a curative, "neutralizing" instruction designed to eliminate any risk of the jury drawing a negative inference from Fleenor's failure to testify. See Bowles, 439 F.2d at 542. Indeed, in circumstances similar to this case, many courts have recognized that such a "neutralizing" instruction should be given when requested by the defendant.[14] However, the defendant failed to request a curative instruction and instead sought to

---

[13]In a supplemental brief filed October 31, 2005, the defendant has argued that, by pleading guilty to first degree murder prior to the defendant's trial, Fleenor waived his constitutional privilege against self-incrimination and was not entitled to invoke the privilege at the defendant's trial, despite the pendency of Fleenor's post-conviction proceeding. We decline to address this issue because the defendant failed to advance it in the lower courts. Indeed, in the trial court the defendant embraced, rather than challenged, Fleenor's invocation of the privilege and argued only that the defense was entitled to have Fleenor assert the privilege in the jury's presence. Because the defendant failed to challenge Fleenor's right to invoke the privilege, and actually embraced Fleenor's assertion of the privilege, for purposes of this appeal we have assumed that Fleenor validly invoked the privilege. We expressly reserve decision on whether a person whose conviction is final and whose post-conviction proceeding is pending may invoke the constitutional right against self-incrimination when called to testify at a co-defendant's trial.

[14]See, e.g., Bowles, 439 F.2d at 542 (leading case); United States v. Martin, 526 F.2d 485, 487 (10th Cir. 1975) (providing a neutralizing instruction, stating "the jury may not draw any inference from the fact that [the witness] did not appear as a witness in this case"); Clayton v. Commonwealth, 786 S.W.2d 866, 868 (Ky. 1990) ("The only instruction regarding the absence of the witness which could have been given, had it been requested, was one stating that he was unavailable to either side."); Haddad, 767 So. 2d at 688 (holding that the trial court erred when it refused the defendant's request to instruct the jury not to draw any inference from the witness's failure to testify); Gagnon, 557 N.E.2d at 737 n.9 (stating that a defendant may request a neutralizing instruction); People v. Dyer, 390 N.W.2d 645, 650-51 (Mich. 1986) ("A neutralizing instruction explains to the jurors that they may not draw an inference from the absence of certain witnesses or engage in speculation about the possible nature of their testimony. Such an instruction, while not mandatory, should be given when requested to avoid prejudice."); State v. Kirk, 651 N.E.2d 981, 984 (Ohio 1995) (holding that, when requested by the defendant, trial courts should instruct juries not to draw inferences from a witness's absence).

-13-

have Fleenor invoke his Fifth Amendment privilege in the jury's presence.[15]  The trial court did not err in refusing to grant this request.

## D.  Alleged Apprendi Error

Relying upon Apprendi v. New Jersey, 530 U.S. 466 (2000), the defendant next contends that the trial court should have dismissed the State's notice of intent to seek the death penalty because the aggravating circumstances were not alleged in the presentment returned by the grand jury.  This Court has repeatedly rejected the defendant's argument.  See, e.g., State v. Reid, 164 S.W.3d 286, 311-12 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 59 (Tenn. 2004); State v. Berry, 141 S.W.3d 549, 562 (Tenn. 2004); State v. Holton, 126 S.W.3d 845, 863 (Tenn. 2004); State v. Dellinger, 79 S.W.3d 458, 466-67 (Tenn. 2002).  Furthermore, the defendant has failed to provide any persuasive reason to overrule these prior decisions.  Therefore, we reaffirm the prior decisions, cited above, and once again hold that neither Apprendi nor its progeny requires the State to allege aggravating circumstances in the charging instrument.  The trial court properly refused to dismiss the State's notice of intent to seek the death penalty on this basis.

## E.  Mandatory Review

Tennessee Code Annotated section 39-13-206(c)(1) (2003) requires appellate courts to review a sentence of death to determine whether the sentence was imposed in any arbitrary fashion; whether the evidence supports the jury's findings of statutory aggravating circumstances; whether the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

### 1.  Arbitrariness

The defendant does not assert that his death sentence was arbitrarily imposed, and a thorough review of the record fails to reveal any basis to support such an assertion.  We conclude that the death sentence was not arbitrarily imposed.

### 2.  Sufficiency of the Evidence

We must next determine whether the evidence is sufficient to support the five aggravating circumstances found by the jury.  See Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), (7), (14) (1999).  In determining whether the evidence supports the jury's findings of statutory aggravating circumstances, we view the evidence in a light most favorable to the State and ask whether a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable

---

[15]During the jury-out hearing, the defense commented that a cautionary instruction rather than Fleenor's in-court assertion of the privilege might remedy the prosecution's improper cross-examination questioning.  However, the defense failed to proffer or to specifically request such an instruction, either at the jury-out offer or proof or when the trial court instructed the jury at the close of proof.  Furthermore, the defendant failed to raise this issue in his motion for new trial and has failed to raise the issue on appeal to the Court of Criminal Appeals or in this Court.

doubt.  <u>Reid</u>, 164 S.W.3d at 314.

We begin with the (i)(14) aggravating circumstance: "[t]he murder victim was seventy (70) years of age or older."  Tenn. Code Ann. § 39-13-204(i)(14).  Prosecution witnesses testified that the victim was eighty-one years old at the time of his murder.  This uncontested proof clearly is sufficient to support the jury's finding of the (i)(14) aggravating circumstance.

Next we consider the (i)(7) aggravating circumstance: "the murder was knowingly committed while the defendant had a substantial role in the commission of a robbery."  Tenn. Code Ann. § 39-13-204(i)(7).  The prosecution's proof showed that the defendant and Fleenor planned the robbery of the victim to obtain money to purchase drugs and that the defendant stole cash, personal property, and prescription drugs from the victim's bait shop and camper.  The evidence is more than sufficient to support the jury's finding of the (i)(7) aggravating circumstance.

We next consider the (i)(6) aggravating circumstance: "[t]he murder was committed for the purpose of avoiding the lawful arrest or prosecution of the defendant."  Tenn. Code Ann. § 39-13-204(i)(6).  The prosecution offered proof to show that the defendant and Fleenor discussed robbing the victim and leaving no witnesses.  They purchased and used gloves in committing the robbery. The proof is sufficient to support the jury's finding of the (i)(6) aggravating circumstance.

The proof also is sufficient to support the jury's finding of the (i)(5) aggravating circumstance: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."  This Court has previously defined  "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious."  <u>State v. Pike</u>, 978 S.W.2d 904, 917 (Tenn. 1998); <u>State v. Williams</u>, 690 S.W.2d 517, 529 (Tenn. 1985).  With respect to "serious physical abuse beyond that necessary to produce death," we have previously explained that "serious" alludes to a matter of degree, and that physical, rather than mental, abuse must be "beyond that" or more than what is "necessary to produce death."  <u>See</u> <u>State v. Nesbit</u>, 978 S.W.2d 872, 887 (Tenn. 1998); <u>Odom</u>, 928 S.W.2d at 26.  The (i)(5) aggravating circumstance may be applied if the evidence is sufficient to support <u>either</u> torture <u>or</u> serious physical abuse beyond that necessary to produce death.  <u>State v. Suttles</u>, 30 S.W.3d 252, 262 (Tenn. 2000).  The prosecution offered proof that the defendant inflicted more than twenty non-fatal stab wounds to the victim's body.  This proof is sufficient to support a finding that the murder involved serious physical abuse beyond that necessary to produce death.  Furthermore, the medical testimony confirmed that the multiple non-fatal stab wounds inflicted upon the victim would have been painful.  Defensive wounds to the victim's body, blood on the bottom of the victim's socks, and other physical evidence of a struggle at the scene, indicated that the victim was alive, conscious, moving away from his attacker, and attempting to defend himself against the defendant's brutal assault.  This evidence is sufficient to support a finding of torture.  In sum, the evidence clearly is sufficient to support the jury's finding of the (i)(5) aggravating circumstance.

Lastly, we consider the sufficiency of the evidence to support the (i)(2) aggravating circumstance: "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person."  Tenn. Code

Ann. § 39-13-204(i)(2). To establish this aggravating circumstance, the State relied upon certified copies of the defendant's two February 1996 aggravated assault convictions out of Hawkins County, Tennessee. The prosecuting attorney appeared and identified the defendant as the person convicted of aggravated assault in Hawkins County in 1996. The State offered no further evidence in support of this aggravating circumstance.

This Court has recognized that the statutory elements of aggravated assault[16] do not necessarily involve the use of violence the person. State v. Sims, 45 S.W.3d 1, 11-12 (Tenn. 2001). As a result, prior convictions for aggravated assault may serve as the basis for a jury's finding of the (i)(2) aggravating circumstance only if the trial court makes a legal determination in a jury-out hearing that the statutory elements of the prior convictions involved the use of violence to the person. Id.; see also State v. Cole, 155 S.W.3d 885, 901-02 (Tenn. 2005); State v. Powers, 101 S.W.3d 383, 400-01 (Tenn. 2003); State v. McKinney, 74 S.W.3d 291, 305 (Tenn. 2002). In determining whether the statutory elements of prior aggravated assault convictions involve the use of violence to the person, trial courts are limited to examining "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Shepard v. United States, __ U.S. __, 125 S. Ct. 1254 (2005). If a prior conviction resulted from a jury trial, trial courts may examine only the charging documents filed in the court of conviction and any instructions given to the jury. Id. at 1259 (citing Taylor v. United States, 495 U.S. 575 (1990)). If a prior conviction resulted from a bench trial, trial courts may consider the "bench-trial judge's formal rulings of law and findings of fact . . . ." Id. If the prior conviction resulted from a guilty plea, trial courts may examine "the statement of factual basis for the charge . . . shown by a transcript of plea colloquy or by written plea agreement presented to the court, or by a record of comparable findings of fact adopted by the defendant upon entering the plea." Id. at 1259-60; see also State v. Rice, __ S.W.3d __ (Tenn. 2006) (discussing Shepard and stating that to determine if the statutory elements of a prior conviction involve the use of violence to the person, trial courts may consider "charging documents, jury instructions, plea agreements or transcripts of the colloquy between judge and defendant in which the defendant confirms the factual basis for the plea, or bench-trial judges' findings of fact and

---

[16]At the time the defendant committed these offenses, Tennessee Code Annotated section 39-13-102(a) provided that a person commits aggravated assault who:

    (1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:
        (A) causes serious bodily injury to another; or
        (B) Uses or displays a deadly weapon; or
    (2) Recklessly commits an assault as defined in § 39-13-101(a)(1), and
        (A) Causes serious bodily injury to another; or
        (B) Uses or displays a deadly weapon.

Section 39-13-102(b) also provided that aggravated assault was committed where a parent or custodian of a child or an adult intentionally or knowingly failed or refused to protect the child or adult from an aggravated assault under subdivision (a)(1) or aggravated child abuse. Subdivision (c) also provided that aggravated assault occurs when a person under a court order against in any way causing or attempting to cause bodily injury or an assault against another intentionally or knowingly attempts to cause or causes bodily injury or commits or attempts to commit an assault against such individual.

rulings of law"). However, an affidavit of complaint may not serve as a basis for a trial court to determine whether the statutory elements of a prior aggravated assault conviction involved the use of violence to the person. State v. David Ivy, __ S.W.3d __, __ (Tenn. 2006). Where the prosecution fails to offer a proper basis from which the trial court may determine whether the statutory elements of the prior aggravated assault convictions involved the use of violence to the person, the evidence shall not be sufficient to support a jury's finding of the (i)(2) aggravating circumstance. Rice, __ S.W.3d at __.

In this case, the prosecution failed to offer the trial court a proper basis from which to determine that the statutory elements of the prior aggravated assault convictions involved the use of violence to the person. Thus, the evidence is insufficient to support the jury's finding of the (i)(2) aggravating circumstance. Rice, __ S.W.3d at __.

Nonetheless, a jury's reliance upon an invalid or inapplicable aggravating circumstance to impose the death penalty will be considered harmless error if the reviewing court concludes "beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid . . . factor." State v. Howell, 868 S.W.2d 238, 262 (Tenn. 1993). The reviewing court must "completely examine the record for the presence of factors which potentially influence[d] the sentence ultimately imposed," including "the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence." Id. at 260-61.[17]

Applying this analysis, we have no hesitation in concluding that the jury's erroneous reliance upon the invalid (i)(2) aggravating circumstance is harmless beyond a reasonable doubt in this case. As previously explained, the evidence supporting the jury's finding of the four remaining valid aggravating circumstances was overwhelming. The defendant robbed and murdered the eighty-one year-old victim to obtain money for drugs. The defendant viciously assaulted the victim and stabbed the victim more than twenty times in order to "leave no witnesses." Certified copies of the 1996 aggravated assault convictions was the only proof offered to establish the invalid (i)(2) aggravating circumstance, and the prosecution did not emphasize this invalid aggravating circumstance during its closing argument. Although the defendant chose to testify at the guilt phase of the trial and to cast blame for the murder upon Fleenor, the defendant elected not to call witnesses in mitigation at the sentencing hearing. Rather, the defendant's mitigation proof consisted of a 1978 psychological report indicating that the defendant's parents were divorced, that the defendant had lived with his grandmother as a child because his mother was not well, physically or mentally, that the defendant had been a below average student, "basically a non-reader" with an I.Q. slightly above the mentally retarded range, and that the defendant had enrolled in vocational school to do automobile body work.

Considering the strength of the four remaining valid aggravating circumstances, the minimal

---

[17]The United States Supreme Court recently refined the test for determining whether a death sentence is unconstitutional when the jury applied an aggravating factor later determined to be invalid. Brown v. Sanders, No. 04-980, slip op. at 7-8 (U.S. January 11, 2006). This new test does not alter our analysis or the result in this case. See Rice, __ S.W.3d at __ n.4.

evidence offered to establish the invalid aggravating circumstance, the innocuous prosecutorial closing argument, and the relatively weak mitigating evidence, we have no hesitation in concluding beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid (i)(2) aggravating factor. Howell, 868 S.W.2d at 262.

In sum, the evidence is sufficient to support the jury's finding of four of the five aggravating circumstances, and the jury's erroneous consideration of the (i)(2) aggravating circumstance is harmless beyond a reasonable doubt.

### 3. Aggravating vs. Mitigating Circumstances

Reviewing the evidence in the light most favorable to the State, we conclude that the evidence is sufficient to support the jury's finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. See Berry, 141 S.W.3d at 570; State v. Carter, 114 S.W.3d 895, 908 (Tenn. 2003); State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 661 (Tenn. 1997).

### 4. Comparative Proportionality Review

Finally, we must determine whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). A death sentence is disproportionate only if "the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed. . . ." Bland, 958 S.W.2d at 665; see also Holton, 126 S.W.3d at 865-66. A death sentence is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. Bland, 958 S.W.2d at 665. Thus, the duty of an appellate court is not to assure "that a sentence less than death was never imposed in a case with similar characteristics," but rather an appellate court is obligated to "assure that no aberrant death sentence is affirmed." Id.

While there is no mathematical or scientific formula involved in comparing similar cases, this Court generally considers: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of provocation; (7) the absence or presence of justification; and (8) the injury to and effects on non-decedent victims. See State v. Vann, 976 S.W.2d 93, 107 (Tenn. 1998) (citing Bland, 958 S.W.2d at 667). When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id. Moreover, in conducting this review, "we select from the pool of cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000) (citing Bland, 958 S.W.2d at 666).

Evaluating the record in this case in light of the relevant factors and the pool of similar cases, we conclude that this case, taken as a whole, is not plainly lacking in circumstances consistent with the circumstances of similar cases in which the death penalty has been imposed. Bland, 958 S.W.2d at 665; see also Holton, 126 S.W.3d at 865-66. The thirty-seven-year-old defendant needed money for drugs and decided to commit a robbery to obtain the money he needed. The defendant planned the robbery and premeditated the murder to conceal the robbery. The defendant chose as his victim an elderly widower who lived alone and whose health was failing. He knew the victim had a reputation of carrying large sums of cash on his person. Not only did the defendant and Fleenor discuss the need to leave no witnesses to the robbery, the defendant purchased gloves for himself and his three accomplices. The group arrived at the bait shop around midnight. The victim was clothed in pajamas when his body was discovered. The defendant lured the victim from his camper under the pretense of purchasing bait and then attacked the victim while the victim was in a vulnerable position, leaning over to scoop minnows from a tank. Using a lock-blade knife, the defendant slashed the victim's neck and stabbed the victim at least twenty-seven times. Although the attack was unprovoked, the medical proof indicated that the elderly victim fought surprisingly well given his failing health, but the victim eventually succumbed to the defendant's vicious attack, after sustaining multiple, painful stab wounds. Making absolutely certain that he had left no witnesses, the defendant shook the victim before leaving the bait shop and then washed his hands and knife in the minnow tank before joining his accomplices in searching for and stealing money and personal items from the victim's bait shop and camper.

The defendant and his accomplices drove to Knoxville, where they purchased and consumed drugs. On the return trip to Sullivan County, the defendant and his accomplices disposed of the victim's gun and personal belongings. After he became a suspect in the murder, the defendant fled to Michigan where he remained until his arrest. The defendant cooperated with the police by surrendering peacefully and by providing statements. However, the defendant recanted his statements at trial and has never expressed remorse for his role in the victim's murder. Rather, the defendant maintained at trial that Fleenor planned and directed the robbery and murder. The record reflects that Fleenor is thirteen years younger than the defendant. Furthermore, the defendant himself admitted having an extensive prior record of criminal activity, which he attributed to his fifteen-year cocaine addiction.

As previously explained, the evidence overwhelmingly supports four of the five aggravating circumstances found by the jury, and the defendant's mitigation proof was relatively weak, consisting primarily of a 1978 psychological report indicating that the defendant's parents were divorced, that his mother was mentally and physically unwell, that he had lived with his grandmother, that he had not performed well academically, that he had been basically unable to read or to write, that his I.Q. had been slightly above the mentally retarded level in 1978, that he had been a non-reader, and that he had enrolled in vocational school. At trial, the defendant also testified that he had been a cocaine addict for fifteen years prior to the victim's murder and had been high on cocaine on the night of the victim's murder.

Although no two capital cases and no two defendants are identical, the following cases and defendants share several similarities with this case and with this defendant. Reid, 164 S.W.3d 286 (defendant kidnapped and stabbed to death two ice cream shop employees during robbery;

aggravating circumstances (i)(2), (i)(5), and (i)(6)); State v. Thomas, 158 S.W.2d 361 (Tenn. 2005) (defendant shot armored truck guard during robbery; aggravating circumstance (i)(2)); State v. Leach, 148 S.W.3d 42 (Tenn. 2004) (defendant beat, stabbed, and strangled two elderly women in order to rob them; aggravating circumstances (i)(2), (i)(5), (i)(7), and (i)(14)); State v. Bane, 57 S.W.3d 411(Tenn. 2001) (defendant and companions robbed and murdered elderly widower during robbery by strangling and asphyxiating him; aggravating circumstances (i)(5) and (i)(6)); State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (defendant repeatedly stabbed seventy-nine-year-old woman to death in course of burglary; aggravating circumstances (i)(5) and (i)(6)); State v. Harris, 839 S.W.2d 54 (Tenn. 1992) (defendant stabbed to death two hotel employees during robbery; aggravating circumstances (i)(2), (i)(5), and (i)(7)); State v. Barber, 753 S.W.2d 659 (Tenn. 1988) (defendant beat elderly woman to death during burglary; aggravating circumstances (i)(5) and (i)(7)); State v. McNish, 727 S.W.2d 490 (Tenn. 1987) (defendant bludgeoned seventy-year-old widow to death in course of robbery; aggravating circumstance (i)(5)); State v. King, 694 S.W.2d 941 (Tenn. 1985) (defendant shot proprietor of tavern to death during robbery; aggravating circumstances (i)(2), (i)(3)[knowingly creating a risk of death to two or more persons other than the victim during the act of murder] and (i)(7)); State v. Barnes, 703 S.W.2d 611 (Tenn. 1983) (defendant and companion beat elderly woman during burglary of her house, victim died of pneumonia resulting from beating; aggravating circumstances (i)(2), (i)(5), and (i)(7)); State v. Campbell, 664 S.W.2d 281 (Tenn. 1984) (defendant beat seventy-two-year-old man to death during robbery; aggravating circumstances (i)(2), (i)(5), and (i)(7)); State v. Harries, 657 S.W.2d 414 (Tenn. 1983) (defendant shot eighteen-year-old store clerk to death; aggravating circumstance (i)(2)); State v. Strouth, 620 S.W.2d 467 (Tenn. 1981), and State v. Dicks, 615 S.W.2d 126 (Tenn. 1981) (companion cases in which elderly store owner's throat was cut during robbery; both defendants received death penalty; aggravating circumstances for both were (i)(5) and (i)(7)).

Having compared the circumstances of the present case with the circumstances of the cases cited above and others not herein detailed, including cases in which the jury did not impose the death penalty,[18] we conclude that this case, taken as a whole, is not plainly lacking in circumstances consistent with other similar cases in which the death penalty has been imposed. Thus, the defendant's sentence of death is not disproportionate considering the circumstances of the crime and the defendant.

### III. CONCLUSION

We have considered the entire record in this case and conclude that the sentence of death was not imposed in an arbitrary fashion, that the sentence of death is not excessive or disproportionate, that the evidence supports the jury's finding of the statutory aggravating circumstances and the jury's finding that these aggravating circumstances outweigh mitigating circumstances beyond a

---

[18]Research revealed only one similar case in which the State sought the death penalty and the case proceeded to a sentencing hearing. State v. Frank Edward Whitmore, No. 03C01-9404-CR-00141, 1997 WL 334904 (Tenn. Crim. App., Knoxville, June 19, 1997), perm. app. denied, (Tenn., Jan. 4, 1999) (State sought the death penalty and a sentencing hearing was held; defendant stabbed to death eighty-year-old victim while breaking into victim's home to commit robbery; jury found no aggravating circumstances and imposed a life sentence; mitigating circumstances in evidence were minor participation in offense and youth of defendant).

reasonable doubt. We also have considered all the defendant's assignments of error and conclude that none requires reversal. The defendant's convictions and sentences are affirmed. The sentence of death shall be carried out as provided by law on the 26th day of July, 2006, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____

WILLIAM M. BARKER, CHIEF JUSTICE