IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 26, 2018

**STATE OF TENNESSEE v. JASON PAUL BAKER**

**Appeal from the Criminal Court for McMinn County**
**No. 13-CR-144      Andrew M. Freiberg, Judge**

_____

**No. E2017-01581-CCA-R3-CD**

_____

The Defendant, Jason Paul Baker, appeals his conviction for premeditated first degree murder and his sentence of life imprisonment without the possibility of parole.  In imposing the sentence, the jury found one aggravating circumstance:  the Defendant was previously convicted of one or more felonies with statutory elements involving the use of violence to the person.  *See* T.C.A. § 39-13-204(i)(2).  On appeal, the Defendant contends: (1) the evidence established that he was insane at the time of the offense; (2) the evidence is insufficient to support his conviction; and (3) the trial court erred during the penalty phase in allowing the State to rely upon the Defendant's prior aggravated assault conviction to establish the (i)(2) aggravating circumstance.  The State concedes that the trial court erred during the penalty phase, and we agree.  Accordingly, we reverse the Defendant's sentence of life imprisonment without the possibility of parole and remand the case to the trial court for entry of a judgment reflecting a sentence of life imprisonment.  We otherwise affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Chessia A. Cox, Athens, Tennessee, for the appellant, Jason Paul Baker.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Dorothy Cherry, Shari Tayloe, and Joe Hoffer, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was charged with premeditated first degree murder after he shot his uncle, Mr. Dennis Patterson, four times with a shotgun and stabbed him seventeen times with a knife on August 26, 2012. Prior to trial, the State filed a notice of its intent to seek a sentence of life without the possibility of parole. The Defendant underwent multiple mental health evaluations prior to trial. In October 2014, he was found to be incompetent to stand trial and was committed to a mental health facility for a period of time. Although the record does not indicate when the Defendant was found to be competent to stand trial, the case proceeded to trial in February 2017.

### Guilt Phase

*The State's Proof*

Following the Defendant's release from prison in August 2012, he began living with his aunt and uncle, Mrs. Lois Patterson and the victim. The Defendant had been living with them for more than two weeks at the time of the victim's death. Mrs. Patterson testified that when the Defendant first arrived, he slept for two or three days and refused to eat or drink. She stated that the Defendant often appeared to talk to his deceased grandmother. Mrs. Patterson told the Defendant that he needed to get his life in order, and the Defendant assured her that he was trying to do so. She tried to help the Defendant obtain his driver's license by assisting him in completing the application.

Mrs. Patterson recalled that the day before the victim's death, the Defendant broke the lawnmower and was worried that the victim would be angry. Mrs. Patterson noted that the Defendant and the victim did not interact often. When Mrs. Patterson awoke on the morning of the victim's death, the victim was mowing the lawn, and the Defendant was in the kitchen. The Defendant claimed to have a tumor in his lungs and claimed that he was going to bleed everywhere. Mrs. Patterson was at work when the victim was killed.

On cross-examination, Mrs. Patterson testified that the Defendant had to be taken to the hospital and prescribed medication on two occasions between his release from prison and the victim's death. She stated that the Defendant occasionally broke out into sweats, made "marks" in a book which he stated were his "secret codes," and said he was making "locks and guns." Mrs. Patterson acknowledged that the Defendant was able to understand the driver's license application and that she assisted him in answering any questions that he did not understand. While Mrs. Patterson was not aware of whether the

Defendant had a mental illness, she stated that she had not seen him in more than two years before he came to live with her and the victim.

Mr. Charles Levasseur, a friend of the victim, assisted the victim in repairing the lawnmower on the evening prior to the victim's death. Mr. Levasseur testified that while he and the victim were repairing the lawnmower, the Defendant was "agitated," was going "up and down," and was getting upset with Mr. Levasseur and the victim. The Defendant would calm down and then become agitated again. Mr. Levasseur recalled that while he and the Defendant were smoking cigarettes on the porch after dinner, the Defendant told him that he was trying to create an invention for Homeland Security and that everyone, including the victim, was not listening to him and not "backing him up." The Defendant said, "People that don't help me move forward … ought to be shot." The Defendant became upset with Mr. Levasseur when Mr. Levassuer disagreed with him over which part of the lawnmower needed repair. After the lawnmower was repaired, the victim began mowing the lawn, and Mr. Levasseur returned to his home.

On cross-examination, Mr. Levasseur testified that the Defendant experienced "different states of agitation" during that evening. While he and the Defendant were smoking, the Defendant told him that he was planning on selling an invention or an idea to Homeland Security but that no one would talk to him. The Defendant grew more upset during the conversation. The Defendant stated that "no one wants to help me" and that they are "all against me." Mr. Levasseur said that although the Defendant stated that "they ought to be shot," the Defendant never specified who "they" were. Mr. Levasseur also said that while the Defendant was "going up and down in agitation," they were both able to understand each other and that at one point, they were able to carry on a conversation about the military.

Ms. Carolyn Goins, the victim's neighbor, testified that on August 26, 2012, she heard gunshots followed by "[a] lot of screaming and yelling and cursing." She heard someone mowing the lawn close to her property line and went outside on her porch. She did not know who was mowing. When the first shot rang out, the lawnmower shut off, and Ms. Goins heard screaming and yelling. After hearing a second shot, Ms. Goins saw a man in a medium blue shirt run to the victim's house and up the deck and try to enter the house. Another shot rang out, and the man ran to the back of the house, turned around, and returned to the door. Ms. Goins heard another shot. She stated that the man continued running from the back of the house to the door but never entered the house. After the man ran to the door for a third time, he fell on the deck in front of the door.

Ms. Goins testified that she must have been in shock and that once she realized what had occurred, she returned inside her home and called 911. She looked outside from her back door and saw a man in a white shirt on the deck. She said the man had the

injured man by the leg in an apparent attempt to move him. Ms. Goins reported to the 911 operator that she believed someone was trying to move the injured man, and she returned to her home because she was afraid. Ms. Goins returned outside once the police officers arrived. She noticed that the victim's truck, which had been parked by an outbuilding, was backed up to the steps of the victim's deck. She did not know the Defendant and had never met him.

Detective Blake Witt and Sergeant Mike Hayes with the McMinn County Sheriff's Office responded to the scene. Detective Witt testified that the Defendant came from behind a burgundy pickup truck and approached Sergeant Hayes in "kind of an erratic" manner. The Defendant was "sweating profusely" and had blood on his chest and around his neck. The Defendant said he was uninjured. Detective Witt had the Defendant sit down by the patrol car and asked him if anyone was injured. The Defendant reported that an injured man was behind an outbuilding, that the man had tried to kill the Defendant, and that the Defendant was defending himself. The officers advised the Defendant that they needed to secure the scene, handcuffed the Defendant for safety purposes, and placed him in the back of the patrol car.

Detective Witt testified that the deck was in disarray, that a truck was backed up to the deck, and that a water hose was running water nearby. The tailgate of the truck was open; there were no items in the bed of the truck; and items were scattered on the grass around the truck. Detective Witt stated that it appeared the items had been removed from the bed of the truck and placed on the ground. The door leading to the home from the deck was open, and the screen door was closed but unlocked. The officers did not find anyone inside the home.

Detective Garry Miller interviewed the Defendant at the scene in Detective Witt's presence. Detective Miller advised the Defendant of his rights, and the Defendant agreed to waive his rights and speak to the officers. Detective Witt stated that the Defendant said that the deceased man was not actually the victim but had "undergone plastic surgery," that the victim attempted to shoot him, that the Defendant grabbed the gun, and that shots were exchanged. Detective Witt also stated that the Defendant's erratic behavior "sort of calmed down a little bit" but that his statements remained consistent. Detective Witt said that the Defendant was responsive to questions and that his responses seemed appropriate.

On cross-examination, Detective Witt testified that the Defendant's behavior was erratic in that he was in a "panic mode" and was "sweating profusely." He denied that the Defendant seemed confused and said that they engaged in a "normal conversation" under the circumstances. Detective Witt stated that there was an audio recording of the

Defendant's interview with Sergeant Miller. However, the recording was not entered as an exhibit at trial.

McMinn County Detective Greg Earps, the lead investigator in the case, went to the scene and viewed the victim's body, which was located behind an outbuilding. The victim's shirt was "bunched up" under his arms, was wet, and was soaked with blood. Detective Earps rolled over the victim's body and saw multiple stab wounds in the victim's back.

Detective Earps observed a lawnmower lodged in an area of tall grass. Although the lawnmower was not running, the key was in the "on" position; the gear shift and blade were engaged; and the parking brake was not set. There was blood on numerous areas of the lawnmower, bird shot pellets on the seat, shotgun wadding on the ground next to the mowing deck, and what appeared to be pellet marks on the hood.

Detective Earps observed blood drops on the ground that made a trail. The blood trail began at the lawnmower, went up to the deck and by the door, and led to behind the outbuilding where the victim's body was located. There were drag marks across stones that led to the outbuilding. The victim's truck was backed up to the deck and was sitting on top of the blood trail. A weed eater was just off the edge of the driveway and in front of the truck. A water hose was coming off the deck and down the steps and was running when officers first arrived. The tailgate of the truck was down, and there were several boxes and bags in the grass that appeared to have come from the bed of the truck. Detective Earps observed blood on the tailgate of the truck, the step bar on the driver's side, and the front seat. The keys to the truck were in the ignition. The victim's glasses were located on the grass near the deck.

Detective Earps found a knife handle that was missing the blade underneath the water hose. He located a towel, a paper towel, and a blue shirt in a chair on the deck. When he moved the towel, he located four spent shotgun shells, one live 12-gauge round, two knife handles, three knife blades, and the victim's cellular phone. A 12-gauge pump action shotgun was lying underneath a picnic table on the deck. At trial, Mrs. Patterson identified the knife handles as belonging to knives from her kitchen. She stated that the shotgun belonged to her and that it was generally kept in the victim's truck. Detective Earps located a gun cabinet in the back bedroom of the home, and the door had been taken off at the hinges. He observed blood on the deck, a grill, the bottom of the storm door, and the outside of the glass on the door.

Detective Earps and Detective Tim Carver interviewed the Defendant. Detective Earps stated that he advised the Defendant of his rights and that the Defendant indicated he understood his rights and agreed to speak to the officers. Detective Earps testified that

the Defendant's answers were not responsive to the officer's questions and that the Defendant was not able to provide any details about what had transpired. Detective Earps explained that when he first asked the Defendant what had occurred, the Defendant began discussing a man who dealt drugs in 1996 and then moved on to how his grandmother died of cancer in 2005. When Detective Earps attempted to redirect the Defendant to the events that led to the victim's death, the Defendant stated that he was "coming off some medication" and that "if this was going to court that he would need a lawyer." Detective Earps stated that the Defendant was cooperative and compliant with his requests.

The Defendant was not wearing a shirt and had blood underneath his chin, down his neck, underneath and around his fingernail on his right hand, and on his ears, his head, his right side, the back of his right arm, his pants, and his shoes. His right sock was saturated in blood. The Defendant was allowed to shower after he was transported to jail. After the Defendant's shower, Detective Earps observed a scratch on the Defendant's right leg, a small cut on one of his fingers, a small abrasion on his neck, a scratch on his left leg, and a small cut on his right ring finger. Detective Earps did not observe any injuries on the Defendant's back or side.

Detective Earps testified that he collected what he believed to be gunshot residue from the Defendant and sent to the Tennessee Bureau of Investigation ("TBI") for testing. The TBI found that the elements indicative of gunshot residue were absent but that the result did not eliminate the possibility that the Defendant could have fired a gun, could have handled a gun, or could have been near a gun when it was fired. Detective Earps took a blood sample from the Defendant at the scene, and the results were negative for drugs.

The Defendant initiated an interview with Detective Earps and Detective Miller a few weeks after the victim's death. Detective Earps advised the Defendant of his rights, and the Defendant waived his rights and agreed to speak with them. The Defendant told the officers that prior to the victim's death, the Defendant was outside and then went inside to use the bathroom. He stated that while he was in the kitchen, the victim accosted him and choked him until he passed out. The Defendant stated that when he awoke, he was covered in blood. He also referenced someone who had plastic surgery to look like the victim. Detective Earps said the Defendant was "very frank" in providing the officers with information.

On cross-examination, Detective Earps testified that his interview with the Defendant at the scene was audio recorded and that his interview at the detective's office was video recorded. Detective Earps described the Defendant as coherent and very cooperative while at the scene. The detective acknowledged that the Defendant's

explanation initially was not coherent but stated that the Defendant was focused on telling him "the story that he wanted to tell." Detective Earps said he stopped questioning the Defendant once the Defendant requested an attorney.

Detective Earps testified that although the Defendant had counsel when he was interviewed several weeks later, Detective Earps did not contact counsel because the Defendant voluntarily waived his rights after the detective "advised him strongly that he had an attorney." At one point, the Defendant mentioned gathering knives to cut weed eater string, but Detective Earps did not see any cut string at the scene. Although Ms. Goins had testified she saw a man in a white shirt, Detective Earps acknowledged that he did not find a white shirt but that he found a light blue shirt and a dark blue shirt.

TBI Special Agent Miranda Gaddes, a forensic scientist in the microanalysis unit, testified that the knife handles went to the knife blades recovered from the scene. TBI Special Agent Teri Arney determined that the spent shotgun casings were fired from the shotgun found at the scene. The unfired shotgun shell was of the same manufacturer and brand as the four fired shotgun casings. TBI Special Agent Jennifer Shipman, a serology and DNA analyst, determined that the victim's blood was on the knife blades, one of the knife handles, the Defendant's jeans and right sock, and a swab taken from the Defendant. A partial profile of the victim's touch DNA was on the other two knife handles.

Dr. Steven Cogswell, a forensic pathologist, performed the autopsy on the victim. He testified that the victim was shot with a shotgun four times, resulting in multiple birdshot pellet wounds. The victim also had seventeen stab wounds on his back, chest, and neck. Dr. Cogswell determined that the victim was shot on the right and left sides of his torso, on the top of his head, and on the edge of his ear. He stated that the birdshot pellets were fairly lightweight and only penetrated the skin and subcutaneous fat and muscle. None of the pellets entered the body cavities, damaged the victim's internal organs, or were fatal.

Dr. Cogswell testified that the gunshot that impacted the left side of the victim's torso resulted in pellet wounds that extended down onto the victim's left leg and also onto his lower left chin. The pellets at the victim's thigh headed in an upward direction, while the pellets below the victim's knee headed in a downward direction. Dr. Cogswell said the direction of the pellets indicated that the victim was in a sitting position when he was shot. Dr. Cogswell stated that the impact of the gunshot to the victim's left torso resulted in a vertical spread of pellets of approximately thirty inches in diameter, and he estimated that as a result, the victim was shot from twenty or more yards away. The impact of the gunshot to the victim's right torso resulted in a pattern of pellets that was approximately twenty inches in diameter. Dr. Cogswell estimated that the victim was

shot in the right torso from fifteen to twenty yards or more away. He stated that the wounds from the gunshots on the left and right sides of the victim's torso were consistent with the victim's driving a lawnmower when he was shot.

Dr. Cogswell testified that a third gunshot impacted the top portion of the victim's head and resulted in a few pellet wounds on his forehead and numerous grazed pellet wounds across the top of his scalp and moving toward the back of his head. Dr. Cogswell determined that the victim was facing the shooter when he received this gunshot wound. The impact of the gunshot resulted in a partial pattern of pellets that was about seven inches in diameter. Because there was only a partial pattern, Dr. Cogswell could not determine the specific distance from which the gun was fired, but he estimated that the shotgun was fired from a close range of ten yards or more.

Dr. Cogswell testified that a fourth gunshot grazed the side of the victim's ear and resulted in pellet wounds down the side of his head and toward his back. Dr. Cogswell stated that the pattern of pellets was tighter than the patterns from the other gunshot wounds and estimated that the shotgun was fired at a distance of less than ten feet.

The victim had five stab wounds on his chest with three down the middle of his chest and one on each side of his upper chest. He also had nine stab wounds on his back, most of which were clustered over the left shoulder blade. The wounds on the victim's back, in combination with the wounds on his chest, struck his left lung and aorta and were fatal wounds. The victim had two stab wounds in the right shoulder that did not strike any vital organs, a stab wound above his left ear that hit his skull, and a stab wound to the neck that penetrated the muscles but did not hit the spinal cord. He also had a gaping stab wound to the left side of the neck that cut the jugular vein, and Dr. Cogswell said this wound alone would have been fatal.

Dr. Cogswell determined that the cause of the victim's death was multiple stab wounds and multiple gunshot wounds. He stated that death would not have been immediate and estimated that it would have taken ten to fifteen minutes and up to possibly thirty minutes for the victim to lose enough blood to result in his death. Dr. Cogswell acknowledged, "That's probably on the outside, but it's certainly longer than one or two minutes." He said the victim's ability to move was only impacted by the stab wounds and the bleeding that resulted.

On cross-examination, Dr. Cogswell testified that the shotgun wounds would have required medical attention. He acknowledged that there was no way to determine the victim's position when he was stabbed. He stated that it was possible the victim was involved in the struggle during which the victim received the stab wounds while the victim and the perpetrator were facing each other but that it was not "terribly likely." On

redirect examination, Dr. Cogswell testified that most of the stab wounds entered straight into the victim's back with little lateral deviation and that such a path was likely more consistent with the perpetrator attacking the victim from behind.

*Defense Proof*

The defense presented the testimony of Dr. Kimberly Brown, a forensic psychologist at Vanderbilt University, whom the trial court accepted as an expert in forensic psychology. Dr. Brown evaluated the Defendant based on a request by the defense and reviewed the Defendant's medical records, jail records, the warrant, the recording of the 911 call, photographs of the crime scene, the Defendant's audio recorded statement on the day of the offense, his video recorded statement at the jail, the autopsy report, witness statements, and TBI reports.

Dr. Brown met with the Defendant on February 26, 2014, while he was incarcerated at Riverbend Maximum Security Institution ("Riverbend"). She was unable to conduct a full interview with the Defendant because most of his answers to her questions were nonsensical. The Defendant had difficulty focusing; his speech did not make sense; and his thinking was disorganized. Dr. Brown stated that from the beginning of the interview, "it was pretty clear that this was someone who was quite psychotic and who was going to have a great deal of difficulty communicating for the interview."

When Dr. Brown asked the Defendant why he was at Riverbend, he responded that "it was a limitation of the Circuit Court in the 10th District." He discussed eight hearings and maintained that his transfer to Riverbend was punishment for the crimes with which "they" were involved, was a way of gagging and hampering him, and was done for financial gain. The Defendant rambled from topic to topic, used words that did not exist, and would begin responding to a question before drifting off and talking about another topic.

Dr. Brown testified that the Defendant had numerous paranoid delusions. He reported feeling confused, disoriented, and isolated but denied feeling homicidal or suicidal at that time. He maintained that prison officials were poisoning his food and milk, that he had been physically and sexually assaulted in jail, and that the Riverbend officials were conspiring with McMinn County officials. He discussed a racketeering organization that involved the mental health institutes where he previously had been treated. He told Dr. Brown that an organized crime group called the "Outlaws" kidnapped and murdered his relatives and were responsible for various sex-related crimes. He referred to "surgical fraud," which Dr. Brown understood to mean that surgeons in the area were changing people's appearances to make them look like others. The Defendant believed that the man whom he killed had plastic surgery and skin grafts

to look like the victim. He maintained that his brother and his mother were imposters and that his actual mother had been kidnapped and possibly murdered.

Dr. Brown testified that the Defendant's responses to her questions about his understanding of the court proceedings were "mostly illogical." The Defendant stated that an attorney "[f]inds mental competency and paralegal assistance and representation of the decorum itself, the decorum and the district you are in." He made up words like "pearlatory" and "unpearlatory" and maintained that the court was involved in a federal trafficking ring.

When questioned about the offense, the Defendant stated that he was the victim and that a group of people were conspiring against him, had killed many members of his family, and were replacing them with imposters. He believed that the group was using his children to make child pornography and that the victim was poisoning his coffee and trying to kill him. The Defendant stated that on the day of the offense, he and the victim argued about child pornography and the murder of his family, that the victim overpowered him and choked him, that the Defendant blacked out, and that the Defendant was covered in blood when he awoke. Dr. Brown stated that the Defendant could not explain how the victim was shot and stabbed and that the Defendant said, "I found him, I found the body."

Dr. Brown testified that the audio recording of the Defendant's statement on the day of the offense provided a "snapshot" of how he presented that day. She stated that the Defendant's behavior and speech while giving the statement established that he was "quite impaired." She also stated that the Defendant's behavior when he gave the statement was similar to his behavior when she attempted to interview him in that he was psychotic, was not making sense, and was unable to carry on a logical conversation. The Defendant discussed various delusional ideas and was "all over the place." He talked to officers about a man named George Sparks who was selling drugs in 1996, the Defendant's grandfather taking platinum valued at one million dollars, and his grandmother dying. The Defendant told the officers that a man informed him that the Defendant's children were being forced to make child pornography and that the Defendant learned that "they" killed "some of his people." The Defendant maintained that his mother was not really his mother and that the DNA of the woman who claimed to be his mother would not match his mother's DNA.

Dr. Brown noted that the Defendant told the officers that he was going to be killed and that he had put "two and two together." The Defendant stated that the victim was not really the victim but a man named "Fred James." He discussed wanting his blood taken to prove a point, but Dr. Brown was unable to follow what point the Defendant wanted to prove. He claimed that various family members had been killed, including his brother,

his father, the victim, and his grandfather. He told the officers that he could provide the officers with all of the information to verify his claims, that "[t]here is proof in a book," and that "[o]thers are going to see the truth." He also told officers that the issues spanned six or eight counties and that they should request assistance from a state investigator. The Defendant maintained that he "kinda blacked out" prior to the events that led to the victim's death. He believed that the victim was an imposter and put something in the Defendant's coffee that morning in an effort to poison him.

Dr. Brown testified that the Defendant experienced a delusion called Capgras Syndrome, which is characterized as a belief that the sufferer's loved ones have been replaced by imposters. She stated that the Defendant believed that the only way the identities of the imposters could be verified was through DNA. She also stated that the Defendant had experienced delusions prior to the date of the offense and noted that according to the records from the facility where the Defendant had been released a few weeks prior to the offense, the Defendant talked about his mother being an imposter and his family members being killed. Dr. Brown noted that the Defendant had long-standing delusions both before and after the offense that he was being poisoned through his food and refused to eat for periods of days.

Dr. Brown reviewed the Defendant's history of mental health issues and stated that his first experience with the mental health system occurred at the age of thirteen when he was hospitalized in an adolescent treatment program from November 1993 until March 1994. He was transferred to another hospital where he remained until April 1994. Dr. Brown noted that the Defendant was not exhibiting psychotic symptoms at that time and explained that such symptoms generally do not emerge at that age. Rather, the Defendant was acting out, being impulsive, getting into trouble, and using drugs. He was hospitalized for approximately one month at the age of sixteen. He had been smoking marijuana, drinking alcohol, was depressed, and had a friend who had died the month prior to the Defendant's hospitalization. The Defendant also received treatment from an outpatient mental health facility.

Dr. Brown testified that in 2010 or 2011, the Defendant began exhibiting psychotic symptoms and having delusions and fixed false beliefs that were often paranoid in nature. He began having disorganized thinking and speech. Although the Defendant was treated for the symptoms, he often refused to take the medication because he believed that the medication was a way in which to poison him.

Dr. Brown testified that the Defendant was in a mental health facility one month before the victim's death, during which time the Defendant discussed his family being killed by a Mexican mafia and his mother being an imposter. During the weeks that the Defendant lived with the Pattersons, he went to the emergency room on two occasions

because he believed that he was being poisoned and was toxic. During his first trip to the emergency room, the Defendant reported that he believed he had contracted a sexually transmitted disease through the laundry and that he had a "foreign object" in his lip. The medical records noted that the Defendant was psychotic and had paranoid delusions. He was prescribed an antibiotic and an antifungal medication and was discharged because he was not found to be an immediate threat to himself or others.

Dr. Brown noted that the Defendant underwent a forensic mental health evaluation by Volunteer Behavioral Health ("Volunteer") in October 2012, a few months after the offense. According to the records, the Defendant was paranoid and delusional and had various conspiracy theories. He also had grandiose delusions where he believed he taught himself three languages and made blueprints for a lock design and tactical assault gear that both the FBI and the TBI wanted. The officials at Volunteer found that the Defendant had highly unrealistic beliefs about his case and was delusional about his attorney. He repeated his beliefs that the victim was an imposter who had been attempting to poison him. The officials noted that the Defendant had relayed a number of conspiracy theories involving his family, the police, and the mental health professionals who had treated him in the past. The Defendant was not taking medication and was not causing problems in jail but was noted to be talking to himself. Based on concerns about the Defendant's mental state at the time of the evaluation, the Defendant was referred to an in-patient forensic evaluation at Moccasin Bend Mental Health Institute ("Moccasin Bend").

While at Moccasin Bend in January 2013, the Defendant repeated his claims that the victim was an imposter and that people had been poisoning his food. He was described as guarded, paranoid, delusional, confused, and disorganized in his thinking. The officials prescribed medication and opined that the Defendant was competent and that an insanity defense could not be supported. Dr. Brown did not know whether the officials at Moccasin Bend had a complete set of the Defendant's medical records.

Dr. Brown diagnosed the Defendant with schizophrenia. She concluded that the Defendant was psychotic at the time of the offense, that the psychosis directly related to the victim and the Defendant's actions in killing the victim, and that the psychosis caused the Defendant not to appreciate the wrongfulness of his actions. Dr. Brown testified that the Defendant believed that the victim was an imminent threat to him and his family. Dr. Brown noted that the Defendant stated following his arrest that he was defending himself and that he later stated that he was the victim. Dr. Brown did not believe that the Defendant was exaggerating during the evaluation and noted that the Defendant had exhibited the same symptoms prior to the offense. She stated that it was difficult to fake the extent of disorganization of thinking demonstrated by the Defendant.

On cross-examination, Dr. Brown testified regarding the Defendant's prior drug use as a teenager and its effect on his mental health. She stated that those who are predisposed to developing schizophrenia and use drugs as teenagers may have psychotic episodes earlier into adulthood than those who are predisposed but do not use drugs. Dr. Brown noted that medical records from 2014 reflected that the Defendant had not used drugs in the past five years and that, thus, drug use should not have caused his mental health issues. Dr. Brown stated that although records from an assessment in July 2010 included a diagnosis of substance abuse disorder, there was no indication that the Defendant was using drugs in 2010. She explained that the diagnosis was made because the Defendant had a drug problem in the past and there was always a risk of recurrence. In 2012, the Defendant was housed at DeBerry Special Needs Facility, which Dr. Brown described as a mental health facility.

Dr. Brown testified that she met with the Defendant for one hour. She did not interview any of the Defendant's family members because she did not believe that the interviews were necessary. She noted that none of the Defendant's family members witnessed the offense and that reports from his family members were in the records.

In addition to schizophrenia, Dr. Brown also diagnosed the Defendant with anti-social personality disorder, which she stated was a diagnosis that often accompanied schizophrenia. She stated that while some people with schizophrenia have hallucinations, the Defendant never admitted to having hallucinations. She stated that only a small portion of those whom she had diagnosed with schizophrenia or another psychosis did not appreciate the wrongfulness of their actions. In explaining her conclusion that the Defendant did not appreciate the wrongfulness of his conduct, Dr. Brown stated that the Defendant "thought that killing someone who was trying to kill him[,] … killed his family[,] and was sexually abusing his kids was the acceptable thing to do, it was the way to protect himself and his family. So, in that way, because of the psychotic disorder and his frame of thinking at that time, he didn't know it was wrong."

Dr. Joe Mount, a psychologist at Middle Tennessee Mental Health Institute ("MTMHI"), was accepted by the trial court as an expert in forensic psychology. A forensic team, which included Dr. Mount, a forensic psychiatrist, a social worker, and a forensic nurse, evaluated the Defendant for a thirty-day period pursuant to a court order in September 2014. Dr. Mount testified that the forensic team determined "almost immediately" that the Defendant was psychotic and delusional. The Defendant's speech was disorganized; he used words that either were made up or did not go together in the same sentence; and he falsely believed that he had cancer and other physical health issues. He was so disorganized that the team was unable to conduct psychological testing.

In October 2014, the forensic team notified the trial court that they believed the Defendant was not competent to stand trial, but they deferred a decision regarding the Defendant's mental state at the time of the offense. Dr. Mount explained that the team wanted to treat the Defendant in an effort to bring him up to the competence necessary to stand trial and examine additional information to determine his mental state at the time of the offense. The Defendant remained hospitalized until July 2015.

Dr. Mount testified that the process by which the team determined the Defendant's state of mind at the time of the offense was similar to the process employed by Dr. Brown. The team did not believe the Defendant was capable of taking personality and other psychological tests. Dr. Mount stated that it was obvious to the team that the Defendant was "overtly and floridly psychotic" and was not malingering. The Defendant was placed on antipsychotic medication, as well as medication to combat the side effects.

The forensic social worker interviewed numerous people who knew the Defendant, including Mrs. Patterson, and the team gathered as many records as possible. Dr. Mount noted that in addition to the Defendant's prior mental health history as testified by Dr. Brown, the Defendant also entered a wilderness program at the age of nine, which Dr. Mount stated was the youngest that he had ever seen anyone sent to a wilderness program. The team reviewed records relating to the offense and the Defendant's audio and video recorded statements.

Dr. Mount testified that in February 2015, the team sent a letter to the trial court in which they stated that the Defendant "was unable to appreciate the wrongfulness of the alleged offense due to mental illness or mental defect. And in this case, it is severe mental illness, schizophrenia." Dr. Mount stated that the conclusion was a unanimous decision reached by the team.

On cross-examination, Dr. Mount testified that the Defendant's Axis II diagnosis was anti-social personality disorder. Dr. Mount acknowledged that those who have the disorder often have difficulty with authority figures, do not like to follow rules, lack empathy for others, may mistreat or injure others, may lie to authority figures, may make up stories to explain their behavior, and may conceal evidence of crimes. Dr. Mount stated that the diagnosis did not entirely explain the Defendant's behavior and that much of his behavior was explained by his psychosis at the time of the offense. Dr. Mount was aware that the Defendant had been diagnosed with oppositional defiant disorder at a young age and explained that the disorder relates to a young person who does not want to follow rules and is oppositional to others.

Dr. Mount testified that the recording of the Defendant's interview with officers on the day of the offense showed the Defendant's mental state at that time. Dr. Mount

did not recall Mrs. Patterson providing information of an antagonistic relationship between the Defendant and the victim or that on the day prior to the offense, the Defendant was afraid of the victim because the Defendant had broken the victim's lawnmower. Dr. Mount acknowledged receiving information about the Defendant's efforts to clean the scene following the offense, and he understood that the Defendant was not on antipsychotic medication at the time of the offense.

The defense recalled Detective Earps and played to the jury his video recorded interview of the Defendant conducted a few weeks after the offense. The video depicted the Defendant informing Detectives Earps and Miller that he was still sick from medication that "he" made the Defendant drink the day before the offense. In response to questioning by the officers, the Defendant stated that the medication was "Hydal HCI time release" medication and a substance that looked like coffee creamer. He said he was still dazed from the medication and had written notes.

An officer asked the Defendant if he was aware that he had an attorney, and the Defendant acknowledged that he had an attorney. He stated that he had asked his attorney to obtain another toxicology test on the Defendant's blood but that his attorney failed to do so. The Defendant maintained that he was the victim in the case. He asked the officers if they had heard the term, "proxy," and then attempted to define it as a threat that he received if he went to law enforcement. When asked why he would be threatened, he stated that those on a list he had prepared were producing and selling child pornography. Detective Earps asked the Defendant whether he had undergone a mental evaluation yet, and the Defendant responded that he had not.

The Defendant told the officers that the deceased man had undergone surgery and that the blood that was on the Defendant would not match "all of them." He stated that he was unsure whose blood was on him but that he assumed the blood belonged to one of the men in his written statement. Detective Miller asked, "We're not running are we?" Detective Earps responded, "Yes." Detective Earps then advised the Defendant of his rights. The Defendant stated that he understood his rights and that he wanted to cooperate. He said that the medication made concentrating difficult; he acknowledged that he had counsel but that counsel would not follow his instruction; and he wanted the District Attorney General to know that he was willing to cooperate.

The Defendant told the officers that the victim was already dead prior to the offense and that the man who was posing as the victim had been engaging in criminal impersonation and working with a group that took the Defendant's information from the Tennessee Department of Correction and was using the Defendant's children to produce child pornography. The Defendant stated that the man who was posing as the victim told

him that "[t]his is what $10,000 to $15,000 worth of plastic surgery will do" and said to the Defendant, "I killed him, and I'm going to kill you too."

The Defendant stated that he had been creating designs for missile defense and border patrol. He said that following his release from prison, "Mr. Kershwen" instructed him to go to Athens, Tennessee, to complete his blueprints. The Defendant said he was instructed to pay "them" half of everything he earned or his family would be murdered. He stated that he went to live with Mrs. Patterson and a man who was supposed to be the victim but that the victim had already been killed. He maintained that financial records and other records would show that "the man" had been meeting people in Cookeville, Chattanooga, and Oak Ridge. The Defendant stated that at one point, the man mentioned "Fred James."

The Defendant told the officers that on the day of the offense, he went to the bathroom and then returned to the kitchen where he saw the man who was posing as the victim. The man accused the Defendant of "stalling" and not drawing anything. The Defendant said after he told the man that he would not agree to help "them," the man grabbed the Defendant by the neck and "choked [him] out." The Defendant maintained that when he awoke, he had blood on him. He also maintained that the blood from the scene would not belong to the victim. He stated that he had been given "psychotrophic" medication and that "Godsey" was traveling to Nashville to have his tattoos removed. The Defendant said he had not abused drugs for more than five years and denied taking drugs since his release from prison. He concluded by stating that his statement may not help him but that "[I]t will help a whole lot of little children."

Detective Earps testified that he was aware that the trial court had ordered the Defendant to undergo a mental health evaluation. Detective Earps did not understand the Defendant's statements regarding designs, blueprints, and missile defense or the names mentioned by the Defendant. Detective Earps stated that the Defendant paused as if he was thinking about what he wanted to say before answering questions.

On cross-examination, Detective Earps recalled that at the preliminary hearing, the general sessions judge granted the Defendant's request to make pro se motions. Detective Earps acknowledged that during the hearing, the Defendant was articulate and responsive to the judge's questions. The Defendant moved for a change of venue, arguing that the victim was well respected in the tight-knit community. On redirect examination, Detective Earps acknowledged that the preliminary hearing was in March 2013 and said he did not know whether the Defendant was medicated at the time of the hearing or during the video recorded interview.

- 16 -

Dr. Stephen Rutledge, a psychologist, was accepted by the trial court as an expert in psychology. He was a member of the team from Moccasin Bend who evaluated the Defendant pursuant to a court order in early 2013. The other members of the team included a psychiatrist, the forensic director, the forensic coordinator, two senior psychological examiners, and a social worker. The Defendant was at the facility for nine days, during which time he was interviewed and administered a cognitive impairment screening test. The team also reviewed the affidavit of complaint, the trial court's order, Volunteer's outpatient evaluation report, a news item from Channel 12, the in-patient referral, notes from the TDOC, and dates from three different facilities. The Defendant was interviewed five or six times. During one interview, the Defendant was tired and experienced problems carrying on a conversation because his mind was wandering.

Dr. Rutledge testified that the Defendant received a score of twenty-three out of thirty on the mini-mental status exam ("MMSE"), which indicated a mild level of cognitive impairment. The cognitive screening test also had an executive function task during which the Defendant was asked to take a piece of paper, fold it in half, and place it on the floor. He took the piece of paper but was unable to complete the other steps. Dr. Rutledge stated that as a result, he believed that the Defendant's executive function "was not in very good shape." The screening test also included a delayed recall task during which the Defendant was given three words, was asked a series of questions, and was then asked to recall the three words. He was able to recall two words and recalled the third word after he was provided a hint. Dr. Rutledge believed that the Defendant's ability to think was "somewhat impaired" by his psychotic illness.

Dr. Rutledge stated that the Defendant had an extensive mental health history that began at childhood. Dr. Rutledge noted that the Defendant was diagnosed as a child with conduct disorder, which involved more aggressive or violent behavior and implied a greater behavioral disturbance than someone with oppositional defiant disorder.

Dr. Rutledge testified that the team diagnosed the Defendant with psychotic disorder, not otherwise specified. He explained that while the team concluded that the Defendant had a psychotic disorder, they were unclear what specific psychotic disorder the Defendant had. Dr. Rutledge noted that the Defendant was delusional but was not hallucinating. The team also diagnosed the Defendant with "preside [sic]," not otherwise specified with anti-social, narcissistic, and paranoid themes. Dr. Rutledge testified that while the team concluded that the Defendant was mentally ill and psychotic, they also unanimously concluded that the Defendant was not under such a mental defect of reason that he was unable to understand the nature and wrongfulness of his actions. They found that the Defendant had the capacity to conform his conduct to the law.

Dr. Rutledge stated that the Defendant said he knew that the term "guilty" meant that "you did it" and that the purpose of a trial was to determine whether a person is guilty or innocent. The Defendant was able to describe "what it took to be termed competent" to stand trial. Dr. Rutledge stated that the Defendant said he wanted to be careful about what he said, which implied that the Defendant understood that whatever he said could incriminate him. While the Defendant was cooperative with the team, he was "disruptive" and "difficult" with other patients. He engaged in a physical altercation with a patient and colluded with another patient against a third patient.

Dr. Rutledge testified that the Defendant's statements about what occurred on the day of the offense were in some ways "confusing," "disjointed," and "contradictory." The Defendant stated that he was concerned about a child pornography ring and that the identity of the victim had been changed through plastic surgery. He mentioned that "it was due to the meds he was on" and referenced "some men who were stressful to the victim." He discussed someone putting medication in his food. He stated that on the day of the offense, he was weed eating and performing yard work. He said he went to the bathroom, returned outside to smoke, and then went inside to retrieve knives. He stated that the victim was the aggressor. When asked about the knives, the Defendant said that he planned to use them to cut the weed eater string and that he took three knives because they were dull. He also said he planned to use the knives to unclog the "string trimmer." He described being choked, losing consciousness, and waking up with blood everywhere.

Dr. Rutledge testified that the Defendant's delusions were not well formed. Dr. Rutledge explained that with a person who has well-formed delusions, the delusions are a part of a larger system of thought and encompass the person's world view. He stated that he had encountered patients who had committed criminal acts but believed they were engaging in some other act that was entirely different from the act they were actually doing. Dr. Rutledge did not believe that the Defendant was one of those patients and explained that the Defendant "believed this, he believed that, he believed that over there. I didn't get a sense of a cohesive system." As a result, the team believed that the Defendant was not "out of control delusionally."

Dr. Rutledge testified that he based his conclusions in part upon the Defendant's actions in cleaning the crime scene, which Dr. Rutledge described as "goal directed behavior." Dr. Rutledge stated, "It seemed to us that [the Defendant] knew that what he had done was not okay, and he needed to tidy it up."

On cross-examination, Dr. Rutledge testified that those whose delusions are well formed behave in ways that serve the delusions regardless of whether such behavior complies with the law. He did not observe that quality in the Defendant. While Dr.

Rutledge did not recall seeing a great deal of narcissism evident in the Defendant, other members of the team did, resulting in the diagnosis.

Dr. Rutledge acknowledged that while the trial court's order allowed Moccasin Bend to evaluate the Defendant for thirty days, the Defendant was discharged after nine days. Dr. Rutledge also acknowledged that the team relied upon a news segment where it was reported that by all accounts, the Defendant and the victim did not get along. The team did not interview family members or those who had made the news report. Dr. Rutledge stated that while the news segment was relevant in determining why the Defendant would commit such an act, it was not considered in his diagnosis or his findings. The team did not receive the autopsy report, the autopsy photographs, the Defendant's recorded interview with the police, or a majority of the Defendant's medical records. Dr. Rutledge acknowledged that Dr. Brown "got all kinds of stuff that we didn't get" and that the additional medical records and discovery possibly could have assisted the team in diagnosing the Defendant. On redirect examination, Dr. Rutledge confirmed that he believed he was able to form a reliable professional opinion based on the interviews with the Defendant and the information that he was given.

McMinn County Sheriff Officer Brian David Buckna, a booking officer, testified that the Defendant was brought to the jail on August 26, 2012, and was kept in the holding cell. Officer Buckna stated that when the Defendant first arrived, he was "calm, cool and collected" and that "[i]t was like nothing bothered him." The Defendant asked for blankets and a mat and then went to sleep after receiving them. Officer Buckna stated that during the next three weeks, the Defendant followed the rules, was able to dress and undress himself, was able to shower without assistance, was aware of his surroundings, was able to communicate, and did not appear to have any lapses in memory. During the first three weeks of the Defendant's incarceration, Officer Buckna did not see any manifestation of mental issues. Toward the end of the three weeks, the Defendant began talking to himself.

On cross-examination, Officer Buckna acknowledged that he did not have any mental health training. He also acknowledged that he could only state that the Defendant generally was compliant with his imprisonment during the first few weeks. Officer Buckna saw the Defendant two or three times a week. Officer Buckna stated that he would not know if officers working on other shifts had problems with the Defendant unless those officers reported them.

Following the conclusion of the proof, the jury returned a verdict finding the Defendant guilty of premeditated first degree murder. The trial then proceeded to the penalty phase.

## Penalty Phase

Prior to trial, the State filed a notice of its intent to seek a sentence of life without the possibility of parole. The State relied on one aggravating circumstance: the Defendant was previously convicted of one or more felonies with statutory elements involving the use of violence to the person. *See* T.C.A. § 39-13-204(i)(2). The State listed the Defendant's prior aggravated assault conviction in September 2010 and his prior aggravated robbery conviction in June 2001 as the basis for applying the prior violent felony aggravating circumstance.

During a jury-out hearing, the trial court found that both aggravated assault and aggravated robbery could be accomplished without the use of violence to the person and that, as a result, the trial court was required to examine the underlying facts supporting the convictions. The State responded that it did not have any information about the underlying facts of the Defendant's prior aggravated robbery conviction. The State provided the trial court with a copy of the indictment and the affidavit of complaint related to the Defendant's prior aggravated assault conviction that resulted from a guilty plea. The indictment and the affidavit of complaint were entered as exhibits to the hearing but are not included in the appellate record.

The trial court read the indictment, which stated that the Defendant "unlawfully and intentionally or knowingly caused [the assault victim] to reasonably fear [im]minent bodily injury while utilizing a deadly weapon, to wit, a loaded firearm." The trial court also read the affidavit of complaint, which provided that on August 13, 2009, the Defendant "did brandish and point a loaded firearm at [the assault victim] causing [him] to fear for his life." The trial court stated that the affidavit of complaint "from that same factual incident" provided that the Defendant "did take from [a second victim's] vehicle, a 2003 Toyota Echo, from [his] possession by force, and used a firearm in the commission of this offense." Based upon the affidavit, the trial court found that the Defendant's aggravated assault conviction was a prior violent felony within the meaning of Tennessee Code Annotated section 39-13-204(i)(2) and allowed the State to rely on the conviction to establish the aggravating circumstance. The trial court found that the State failed to establish that the Defendant's aggravated robbery conviction was a prior violent felony within the meaning of section 39-13-204(i)(2).

During the penalty phase, the State entered a certified copy of the judgment of the Defendant's prior aggravated assault conviction into evidence. The State also read a letter from Mr. Brian Patterson, the victim's son, regarding the victim's life and the impact of the victim's death. The Defendant presented the testimony of his mother, Ms. Gail Owings, who testified regarding the Defendant's history of mental health problems and his history of drug and alcohol abuse.

- 20 -

At the conclusion of the hearing, the jury sentenced the Defendant to life without the possibility of parole. The Defendant filed a motion for new trial, which the trial court denied. The Defendant then filed a timely notice of appeal.

## ANALYSIS

### I. Insanity

The Defendant maintains that the evidence established that he was insane at the time of the offense. The State responds that substantial proof was presented at trial supporting the jury's rejection of the Defendant's insanity defense. We agree with the State.

Tennessee Code Annotated section 39-11-501 provides:

(a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

On appeal, this court "should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." *State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002). Clear and convincing evidence is "'evidence in which there is not serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). This reasonableness standard of review is similar to the standard of review that this court applies in reviewing the sufficiency of the convicting evidence. *Flake*, 88 S.W.3d at 551. In applying this standard, this court "should consider all the evidence in the record in the

light most favorable to the [S]tate in determining whether the jury appropriately rejected the insanity defense." *Id.* When the evidence is contested, this court "should rarely reverse a jury's rejection of the insanity defense under this deferential standard of review." *Id.* at 556.

The Defendant asserts that once he established that he was insane at the time of the offense, the State was required to rebut the defense by presenting evidence that established the Defendant's sanity beyond a reasonable doubt. Although the State must establish all essential elements of a criminal offense beyond a reasonable doubt, "sanity is not an element of a crime." *Holder*, 15 S.W.3d at 911 (citing *Patterson v. New York*, 432 U.S. 197, 204-26 (1977)). Tennessee Code Annotated section 39-11-501 provides that the defendant has the burden of establishing the affirmative defense of insanity by clear and convincing evidence. *See Flake*, 88 S.W.3d at 554. The Tennessee Supreme Court has "explicitly reject[ed] the notion that the State must rebut defense proof of insanity with substantial evidence." *Id.* The State may counter the defendant's proof "by contrary expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense expert." *Id.*

"In determining whether a defendant is insane, a jury is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony of lay witnesses, and expert testimony." *Id.* at 556. If expert testimony is presented at trial, the jury must evaluate the credibility of the expert witnesses, determine the weight and value of this testimony, and resolve all factual disputes raised by the evidence. *Id.* at 554 (citing *Edwards v. State*, 540 S.W.2d 641, 647 (Tenn. 1976)). This court will not reweigh the evidence or reevaluate the jury's credibility determinations. *Id.* (citing *Holder*, 15 S.W.3d at 912). "Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case." *Id.* (citing *Edwards*, 540 S.W.2d at 647). Although a jury "may not arbitrarily ignore [expert] evidence," it is "not bound to accept the testimony of experts where the evidence is contested." *Id.* at 556.

All of the experts who testified at trial agreed that the Defendant suffered from a severe mental disease. However, Dr. Rutledge disagreed with Dr. Brown and Dr. Mount on whether the Defendant could appreciate the nature and wrongfulness of his conduct. Dr. Rutledge pointed to several facts regarding the Defendant's actions to support his opinion that the Defendant appreciated the nature and wrongfulness of his conduct, and Dr. Rutledge's opinion was corroborated by additional proof offered by the State.

Dr. Rutledge evaluated the Defendant within months of the offense, while Dr. Brown and Dr. Mount evaluated him more than one or two years after the offense. Dr.

Rutledge testified that the Defendant's delusions were not well formed, that he was not "out of control delusionally," and that in committing the offense, the Defendant did not believe he was engaging in entirely different conduct. On the evening prior to the offense, the Defendant expressed his frustration to Mr. Levasseur that the victim and others were not supporting the Defendant's efforts to create an invention for Homeland Security and that those who refused to help him "ought to be shot." The Defendant's statements regarding the victim's lack of support are not consistent with his claims following the offense that the victim was an imposter who was poisoning him and was part of a group that was forcing him to create the inventions. Moreover, although the Defendant expressed different levels of agitation on the evening before the offense, Mr. Levasseur was able to carry on a conversation with him, and they were able to voice their disagreement over the required lawnmower repairs.

The Defendant offered contradictory statements regarding the events that led to the victim's death. Shortly after the victim's death, the Defendant told officers that he killed the victim in self-defense, that the victim attempted to shoot him, that they struggled, and that shots were exchanged. It was weeks after the offense that the Defendant first claimed that the victim attacked him, that the Defendant lost consciousness, and that he was covered in blood when he awoke and did not recall how the victim died. He was unable to offer Dr. Rutledge a reasonable explanation for his retrieval of the knives from the kitchen. Dr. Rutledge stated that the Defendant was careful in responding to questions, which implied that he was aware that he could incriminate himself. Likewise, Detective Earps stated that during the video recorded interview, the Defendant paused before answering questions as if he was thinking about what he wanted to say.

Dr. Rutledge focused on the Defendant's efforts to conceal the victim's body and clean up the crime scene as evidence that he understood what he had done was wrong. The Defendant collected the knife handles, the knife blades, the shotgun shells, and the victim's cellular phone in a towel and removed his shirt. He dragged the victim's body from the deck and hid the body behind a shed. Police officers arrived to find a water hose running on the deck in an apparent effort to wash away physical evidence. They also observed the victim's pickup truck moved up to the deck, the tailgate down, the bed of the truck cleaned out, and items scattered on the grass. The jury could reasonably infer that the Defendant had been preparing to place the victim's body or evidence from the scene in the bed of the truck for disposal.

Officer Buckna reported that when the Defendant arrived at the jail on the day of the offense, he was calm, pleasant, and able to communicate without any issues. The Defendant requested a blanket and a mat and went to sleep. He followed the rules in the jail and was cooperative with the mental health professionals. However, while at

Moccasin Bend, he fought with other patients and colluded with another patient against a third patient. The jury could reasonably infer from this behavior that the Defendant was able to conform his behavior to the rules when he chose to do so.

While the Defendant asserts that the jury erred in not finding him insane at the time of the offense, the jury chose to credit the State's expert witness over the Defendant's expert witnesses, and we will not disturb the jury's verdict. *See State v. Colvett*, 481 S.W.3d 172, 198 (Tenn. Crim. App. 2014). Viewing the evidence in the light most favorable to the State, we conclude that the jury reasonably could have found that the Defendant failed to establish that he was insane at the time of the offenses by clear and convincing evidence. *See Flake*, 88 S.W.3d at 554.

## II. Sufficiency

The Defendant maintains that the evidence is insufficient to sustain his conviction for premeditated first degree murder and that the trial court erred in denying his motion for new trial based on the insufficiency of the evidence. He specifically challenges the sufficiency of the evidence of premeditation. The State responds that the evidence is sufficient to support the conviction, and we agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a

conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id*. The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*.

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id*. at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; and preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id*. Repeated blows, although not alone sufficient to establish premeditation, may be a relevant factor in determining the existence of premeditation. *Id*. Mutilation of the body may show that a killing was not rash or impulsive. *Davidson*, 121 S.W.3d at 615. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). "Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation." *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013).

There was evidence presented at trial that the Defendant suffered a severe mental disease and experienced delusions. This court has described "the exercise of reflection and judgment" necessary for premeditation as "a fixing of one's thoughts upon murdering the victim and forming an opinion or conclusion from those thoughts." *State v. Brandon Ray Roland*, No. E2002-00927-CCA-R3-CD, 2003 WL 21983024, at *9 (Tenn. Crim.

- 25 -

App. Aug. 21, 2003) (citing *State v. Daryl Keith Holton*, No. M2000-00766-CCA-R3-DD, 2002 WL 1574995, at *19 (Tenn. Crim. App. July 17, 2002), *aff'd* 126 S.W.3d 845 (Tenn. 2004)). "The fact that a defendant's judgment and thought process may be adversely impacted by a mental disease or defect does not necessarily render the defendant incapable of premeditation." *Id.*; *see Holder*, 15 S.W.3d at 913 ("This Court may not assume that a defendant suffering from paranoid schizophrenia accompanied by delusions is necessarily incapable of premeditated murder.").

For example, in *State v. Holder*, this court held that the evidence was sufficient to support premeditation despite the defendant's paranoid schizophrenia and his delusion that God had order him to kill the victim. 15 S.W.3d at 913. In *State v. Brian Val Kelley*, this court upheld a defendant's conviction for premeditated first degree murder even though the defendant was suffering from a severe mental disease or defect and had a delusion that killing his daughter would "pave the way for Christ's second coming," and this court considered the delusion as evidence of premeditation, noting that the defendant "argued with God when he first received instructions to kill his child." No. M2001-00461-CCA-R3-CD, 2002 WL 927610, at *22 (Tenn. Crim. App. May 7, 2002). Accordingly, "'a criminal defendant may fix his thoughts upon murder and form an opinion or conclusion thereon prior to committing the murder although the facts upon which he bases his intent to kill are the product of delusions stemming from a mental illness or defect.'" *State v. Glen Chandler*, No. M2002-00207-CCA-R3-CD, 2003 WL 22116631, at *6 (Tenn. Crim. App. Sept. 12, 2003) (quoting *Daryl Keith Holton*, 2002 WL 1574995, at *19).

The evidence presented at trial, when viewed in a light most favorable to the State, established that on the evening prior to the victim's death, the Defendant stated that he was creating an invention for Homeland Security, that the victim and others were not supporting him, and that those who did not help him "move forward … ought to be shot." While the victim was mowing on the following day, the Defendant retrieved multiple knives from the kitchen and a shotgun from either the victim's truck or his bedroom. The Defendant began shooting the victim while the victim was mowing. The victim was unarmed and attempted to escape. The Defendant shot the victim four times and stabbed him seventeen times, and the jury rejected the Defendant's statements that the victim was the initial aggressor. He did not render any aid to the victim and was in the process of concealing the victim's body and other evidence when the police officers arrived. We conclude that such evidence is sufficient to support the jury's finding that the Defendant killed the victim intentionally and with premeditation.

### III. Sentence of Life Without Parole

The Defendant asserts that the trial court erred in allowing the State to rely upon his prior conviction for aggravated assault to establish the prior violent felony aggravating circumstance. *See* T.C.A. § 39-13-204(i)(2). The State concedes error, and we agree that the trial court erred.

The possible sentences for a first degree murder conviction are life, life without the possibility of parole, and the death penalty. T.C.A. § 39-13-204(a). Following a guilty verdict, the jury must consider the appropriate sentence in a separate sentencing hearing. *Id.* A sentence of life without parole may be fixed if the jury finds beyond a reasonable doubt that one or more statutory aggravating factors exist. T.C.A. § 39-13-204(e), (f). In determining the proper sentence, the jury must weigh and consider any aggravating factors proven beyond a reasonable doubt by the State and any mitigating circumstances. T.C.A. § 39-13-204(f)(2).

The State relied upon one aggravating circumstance in section 39-13-204(i)(2), "The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." The trial court allowed the State to proceed based upon the Defendant's prior aggravated assault conviction. Our supreme court has recognized that the statutory elements of aggravated assault do not necessarily involve the use of violence to the person. *State v. Rollins*, 188 S.W.3d 553, 572-73 (Tenn. 2006); *State v. Sims*, 45 S.W.3d 1, 11-12 (Tenn. 2001); *see* T.C.A. § 39-13-102(a) (Supp. 2009). Thus, "prior convictions for aggravated assault may serve as the basis for a jury's finding of the (i)(2) aggravating circumstance only if the trial court makes a legal determination in a jury-out hearing that the statutory elements of the prior convictions involved the use of violence to the person." *Rollins*, 188 S.W.3d at 573 (citations omitted). In making such a determination, the trial court is limited to examining "'the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented.'" *Id.* (quoting *Shepard v. United States*, 544 U.S. 13, 16 (2005)). Because the Defendant's prior aggravated assault conviction was the result of a guilty plea, the trial court also was allowed to examine "'the statement of factual basis for the charge … shown by a transcript of plea colloquy or by written plea agreement presented to the court, or by a record of comparable findings of fact adopted by the defendant upon entering the plea.'" *Id.* (quoting *Shepard*, 544 U.S. at 20).

The trial court properly considered the indictment to which the Defendant pled guilty in determining whether the prior aggravated assault conviction involved the use of violence to the person. The indictment charged the Defendant with aggravated assault for intentionally or knowingly causing the assault victim to reasonably fear imminent bodily

- 27 -

injury while utilizing a deadly weapon. *See* T.C.A. §§ 39-13-101(a)(2) (Supp. 2009); 39-13-102(a)(1)(B) (Supp. 2009). Our supreme court has held that aggravated assault involving the use or display of a deadly weapon does not necessarily involve the use of violence to the person and that a review of the underlying facts by the trial court is necessary. *See Sims*, 45 S.W.3d at 10-11; *State v. Ivy*, 188 S.W.3d 132, 150-52 (Tenn. 2006). The trial court also relied upon the affidavit of complaint. However, a trial court may not consider an affidavit of complaint in determining whether the statutory elements of a prior aggravated assault conviction involved the use of violence to the person. *Id.* at 152.

We note that during the hearing on the Defendant's motion for new trial, the State presented the transcript of the plea hearing for the Defendant's prior aggravated assault conviction. However, the State did not present this transcript during the jury-out hearing at trial. Furthermore, the transcript of the hearing reflected that the Defendant waived the presentation of the factual basis for his guilty plea. Therefore, the transcript did not include any factual basis to which the Defendant assented by entering the plea and, thus, could not have served as a basis upon which the trial court determined whether the Defendant's prior aggravated assault conviction involved the use of violence to the person. *See Shepard*, 544 U.S. at 20; *Rollins*, 188 S.W.3d at 573.

Because the State failed to meet its burden by presenting the trial court with a proper basis from which to determine that the statutory elements of the Defendant's prior aggravated assault conviction involved the use of violence to the person, the evidence is insufficient to support the jury's findings of the (i)(2) aggravating circumstance. *See Rollins*, 188 S.W.3d at 574 (citing *State v. Rice*, 184 S.W.3d 646, 677 (Tenn. 2006)). Accordingly, we reverse the Defendant's sentence of life without the possibility of parole and remand to the trial court for entry of a judgment reflecting a sentence of life imprisonment.

## CONCLUSION

We affirm the Defendant's conviction for premeditated first degree murder. We reverse the Defendant's sentence of life without the possibility of parole and remand to the trial court for entry of a judgment reflecting a sentence of life imprisonment.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 28 -